2020 UT App 116

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CHRISTOPHER KIM LEECH,
Appellant.

OpinionOpinion
No. 20160995-CA
Filed August 13, 2020

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 141900235

Debra M. Nelson, Wojciech S. Nitecki, Lacey C.
Singleton, and Melissa G. Stirba,
Attorneys for Appellant

Sean D. Reyes and John J. Nielsen,
Attorneys for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES JILL M. POHLMAN and RYAN M. HARRIS concurred.

HAGEN, Judge:

¶1      As payback for a drug deal gone wrong, Christopher Kim Leech allegedly robbed and kidnapped two men, forced one to shoot the other, and then directed his cohorts to cover up the crimes. Leech was ultimately convicted on two counts of aggravated kidnapping, two counts of aggravated robbery, one count of aggravated murder, and one count of obstruction of justice. Leech appeals his convictions, arguing that the district court erroneously admitted the preliminary hearing testimony of a witness who refused to testify at trial. We agree with Leech that the preliminary hearing testimony was not admissible under rule 804(b)(1) of the Utah Rules of Evidence because the

defense did not have a similar motive and opportunity to develop the witness's testimony at the preliminary hearing as it would have had if the witness had testified at trial. We further conclude that the admission of this testimony prejudiced his defense with respect to his conviction for obstruction of justice, but not his remaining convictions. Accordingly, we affirm his convictions for aggravated kidnapping, aggravated robbery, and aggravated murder, but reverse and remand for a new trial on the obstruction of justice count.

## BACKGROUND

### *The Crimes*[1]

¶2 In late November 2013, a drug middleman (the middleman) was contacted by an old friend from high school (the dealer) who requested "a quarter pound" of methamphetamine because the middleman could "get it cheaper" than she could. The dealer gave the middleman $2,200 and a rental car to pick up the methamphetamine. The middleman's source for methamphetamine had only two of the four ounces that the dealer needed, but the source promised the middleman he would deliver the other two ounces the following day. But when the next day came, the middleman could not get ahold of his source. Meanwhile, the dealer was growing increasingly impatient. She told the

---

1. "On appeal from a jury verdict, we view the evidence and all reasonable inferences in the light most favorable to that verdict and recite the facts accordingly." *State v. Scott*, 2020 UT 13, ¶ 5 n.3, 462 P.3d 350. In doing so, we do not suggest that this is the only version of the facts that could be supported by the evidence. If the State elects to retry Leech on the obstruction count, a newly empaneled jury must draw its own conclusions from the evidence presented in that trial.

middleman that her customers were waiting and that "[he] needed to hurry up."

¶3 The middleman contacted his best friend (the victim) who "said that he could get . . . [t]he other two ounces" but that "it was going to be a little bit more expensive." The middleman gave the remaining cash and the rental car to the victim so that the victim could obtain the additional two ounces. The two ounces of methamphetamine that the middleman had already acquired were still hidden in the trunk of the rental car.

¶4 For the next few hours, the middleman "dodged" the dealer's phone calls and waited for the victim to come back with the drugs. Eventually, after hearing nothing from the victim, the middleman called the dealer and told her that she needed to pick him up.

¶5 After picking up the middleman, the dealer drove him to her mother's house (the house), where they waited until her boyfriend, known as T.J., arrived. T.J., the dealer, and the middleman then drove around surrounding neighborhoods looking for the victim. The dealer "was a little stressed out" and told the middleman that she "was just tired of people ripping her off." They could not find the victim, so they returned to the house and smoked methamphetamine in the garage.

¶6 After a while, the dealer "heard a truck pull up" and told the middleman, "[W]e need to figure this out because [Leech is] here and he [is] going to freak out."[2] Sure enough, Leech went

_____

2. There is no satisfying explanation for Leech's involvement, much less the intensity of his reaction. Although Leech was dating one of the dealer's sisters, the record suggests he had no other connection to the drug deal. At trial, the defense made much of the fact that Leech had "no motive" because he had "nothing to do with this drug transaction" and "no dog in this

(continued…)

into the garage, "pulled out a gun," and asked the middleman "what was going on" and "what the problem was." The middleman said that he "was taking care of it," but Leech, gun still in hand, told the middleman that "it didn't seem like [he] was taking care of shit and that if [he] didn't get it taken care of it was [his] ass."

¶7      Leech kept the middleman in the garage while the dealer continued to look for the victim. There were other people in the house during this time. One of the witnesses testified that when the middleman tried to come inside the house to use the restroom, Leech and T.J. put "guns in [his] face" and "shov[ed] him back into the garage." According to the witness, Leech said he "[could]n't wait until he f[ound]" the victim because "he was going to make [the middleman and the victim] pay for what they did. That he was going to shoot [them] . . . [b]ecause they took from [the dealer]." The witness testified that all the men present agreed and there "was a lot of adrenaline going."

¶8      Eventually, the dealer left the house with Leech, T.J., and the middleman and went to her uncle's apartment (the apartment). At some point, one of the dealer's sisters and her

---

(…continued)
fight." The State argued that Leech was trying to send a message: "You don't steal from my girlfriend's sister." But it acknowledged that Leech's reaction was "over the top" and "nonsensical." In closing argument, the State recognized that it made no "sense why [Leech] is doing this and acting just so out of control for a couple of ounces of meth and a rental car, both of which he got—everything back," but it reminded the jury that it had no burden to prove motive and that "this is one of those cases" where the "why" is "inexplicable."

husband, known as Juice, joined them.[3] While at the apartment, a cell phone rang with an incoming call from the victim. Leech handed the cell phone to Juice and had him tell the victim that "if he brought the car [back] right now, . . . he gave his word nothing would happen to him." Juice told the victim to meet them at the apartment and gave him the address. As they waited for the victim to arrive, Leech "looked mad" and the middleman was "really quiet . . . and he looked scared."

¶9     When the victim arrived at the apartment, Leech pointed his gun at the middleman and the victim and ordered them to lie on the floor. Juice pulled out a gun, too. At Leech's direction, T.J. retrieved some speaker wire from his truck and tied the middleman's and the victim's hands behind their backs while Leech took all their belongings from their pockets. Leech and T.J. then blindfolded the two men by making a hole in the hood of each man's sweatshirt and tying it to the zipper with speaker wire. They also removed the two men's shoes.

¶10    At Leech's direction, the middleman and the victim were led out of the apartment and forced into a truck. As they were leaving, Juice's wife asked what was going to happen to them. Leech told her, "[D]on't worry, nothing's going to happen to them. I'm going to have them . . . walk down the mountain with their bare feet." Juice's wife told Leech that her husband was not going with him, but Leech responded by "pointing the gun towards [her,] and Juice automatically went out the door with

---

3. It is unclear from the testimony at trial whether Juice and his wife were among the group at the house while the middleman was being held in the garage or whether they made their first appearance in this series of events at the apartment. However, the timing of their appearance on the scene is not critical to our analysis.

Leech." She testified that "[w]hen they all left, [she] didn't think any of them," except Leech, "were coming back."

¶11   What happened next is based solely on the middleman's testimony. According to the middleman, T.J. drove him, the victim, Juice, and Leech up a canyon. On the way, the victim pleaded with Leech that "he didn't have to do this, just to let [them] go and [they] wouldn't say anything." But Leech told him to "[s]hut the fuck up, it's too late."

¶12   Once they reached their destination, Leech said he would take the victim and told Juice to take the middleman. They led the blindfolded men out of the truck and down a hill covered in dirt and ice. At the bottom of the hill, the middleman and the victim were forced to kneel at the top of an embankment. Someone released their blindfolds, and the victim turned to the middleman and said, "Sorry, bro, I guess this is it." Leech then shot the victim in the back. The middleman saw the victim roll down the embankment and heard him say, "I'm dead."

¶13   The middleman "tensed up and stared off ahead," just "waiting to get shot." Then someone cut his hands loose. Leech grabbed the middleman, pulled him to his feet, and said, "There is your homeboy . . . . Finish [him] or you're next." Leech held one gun to the back of the middleman's head and handed him a second gun with a single bullet in the chamber. The middleman pointed the gun at the victim and pulled the trigger, but the gun jammed. When he turned to hand the gun back to Leech, he saw Juice and T.J. standing behind him. Leech took the gun, reloaded it, and handed it back to the middleman. With Leech's gun still trained on him, the middleman shot the victim in the head and handed the gun back to Leech.

¶14   Just then, Leech saw headlights coming down the road at the top of the hill and told everyone to stop. Once the car passed, Leech said, "Let's go." T.J. led the way back up the hill with Juice, the middleman, and Leech following behind. At that point,

the middleman saw that the other two men were armed with guns as well.

¶15    According to the middleman, Leech then orchestrated a plan to dispose of the evidence. Leech said that he would "take care of the guns" and told T.J. to detail clean his truck. Leech told the middleman that he should continue to look for the victim as if "nothing happened." When they got back to the house, Leech instructed the middleman to take a shower, leave his clothes outside the bathroom door, and change into fresh clothes that the dealer provided. When the middleman got out of the shower, his clothes were gone. A few days later, the dealer returned the middleman's cell phone to him, but "the call log and the text messages were deleted." The dealer told the middleman that she had asked Leech not to hurt him and was glad he was okay.

¶16    The middleman was arrested shortly thereafter on an unrelated weapons charge. After his girlfriend bailed him out of jail, he told her what had happened with the victim. The middleman's girlfriend called the FBI.

¶17    The middleman was already acquainted with the FBI because he had been working as a cooperator, providing information on the drug cartel that supplied him with methamphetamine. But when he was interviewed about the victim's murder, the middleman lied to the FBI about "everything" that had happened that day before the men left for the canyon. The middleman was interviewed by the FBI "three or four" times, during which he "changed [his] story a few times." At trial, the middleman claimed that he had lied in an attempt to "protect" the dealer because he felt she saved his life by telling Leech not to kill him.

¶18    The middleman attempted to lead law enforcement to the victim's body multiple times, but was never able to find its location. Law enforcement eventually secured T.J.'s cooperation,

and he led police to the scene of the shooting. To recover the victim's body, the officers parked on an "unimproved road," "passed through a gate, went down a hill, and walked down a small embankment." The victim's shoeless body was clothed in a hoodie with a hole cut into the hood. His wrists appeared to have been bound with speaker wire and he had suffered one gunshot wound to his torso and one to his head. The medical examiner determined that either shot would have been fatal.

*The Preliminary Hearing*

¶19    The State charged Leech with two counts of aggravated kidnapping, two counts of aggravated robbery, one count of aggravated murder, and one count of obstruction of justice, all first-degree felonies. The State charged others involved in these events with various crimes as well.

¶20    The district court held a joint preliminary hearing for Leech, the dealer, and Juice. At the preliminary hearing, the district court judge, acting as a magistrate, explained to the co-defendants,

> This is a preliminary hearing and the purpose of this proceeding . . . is for the State to put on evidence in an effort to demonstrate probable cause that the offenses charged were committed and that you were the ones who committed those offenses.
>
> So this is a probable cause hearing, it's not a trial. Different standards of proof apply at a probable cause hearing than apply at trial. One of the most important ones is that any doubts or questions about evidence at a preliminary hearing get resolved in favor of the State and against the defendants. So the benefit of the doubt goes to the State in a preliminary hearing.

> Probable cause means enough evidence that the Court is convinced that a reasonable jury could find, not that they necessarily would, but that they could find the offenses charged were committed and that you were the individuals who committed them. If probable cause is found under that analysis, then the case would be bound over for further proceedings at which time you would all be afforded your entire complement of constitutional rights . . . .

¶21 The State then called its witnesses, including eyewitnesses, the chief medical examiner for the State of Utah, and a detective. Relevant to this appeal, the State called T.J. to testify about his involvement in the crimes. At the preliminary hearing, Leech's counsel cross-examined each of the State's witnesses, including T.J.

¶22 In his preliminary hearing testimony, T.J. largely corroborated the middleman's testimony. T.J. testified that, at the apartment, he saw Leech order the middleman and the victim to get down on the floor at gunpoint. Leech asked T.J. if he had any rope, and T.J. retrieved some old speaker wire from his truck. Leech told T.J. to tie up both men. When T.J. failed to do it properly, Leech gave him instructions on how "to cross the hands" and then took over tying the other man's wrists. After Leech emptied both men's pockets, he told T.J. to pull his truck around back. T.J. did so and waited in his truck.

¶23 A short time later, T.J. saw the other four men emerge from the apartment, with Juice escorting the victim and Leech escorting the middleman. The captive men's eyes were covered by their hoods, which had been tied tightly around their faces. T.J. testified that Juice and Leech placed the men into the back seat of T.J.'s truck, with Juice climbing in after them. Leech got into the front passenger seat and told T.J. to drive. Leech

directed T.J. where to go and eventually told him to pull off on a side road near a ski resort.

¶24    When they got out of the truck, Leech asked T.J. for his gun. T.J. gave his gun to Leech, who already had his own gun tucked in the waistband of his pants. T.J. testified that Leech then led the victim and the middleman down the hill while he and Juice followed behind. Eventually, Leech stopped and told the victim and the middleman to kneel on the ground. Leech then shot the victim from behind, causing him to roll about ten feet down the hill. T.J. saw Leech say something to the middleman, but he could not hear what was said. The middleman got up, and he and Leech walked down to the victim. T.J. saw Leech give the middleman a gun and then saw the middleman shoot the victim once before handing the gun back to Leech.

¶25    Afterward, Leech said he would "get rid of" T.J.'s gun. T.J. testified that he did not know what happened to the gun and never saw it again. Leech also instructed T.J. to detail his truck and get rid of his clothes. T.J. kept his clothes and never detailed his truck, but he gave Juice his boots, along with the clothes the middleman left outside the bathroom when he showered. T.J. testified that he heard Leech tell Juice to burn the clothes and the boots.

¶26    At the conclusion of the preliminary hearing, the district court found that the State had "established probable cause that [Leech] . . . committed all of the offenses charged," and the case proceeded to trial in September 2016.

*The Trial*

¶27    At trial, just after jury selection, T.J. took the stand outside the presence of the jury and told the court that he refused to testify. T.J. had been given conditional use immunity, meaning that any truthful testimony T.J. gave at Leech's trial could not be

used against him at his own trial. The court informed T.J. that his refusal to testify despite the grant of immunity meant that he "would be found in contempt of court." The court ordered T.J. to testify, but he refused to do so.

¶28    After T.J. refused to testify, the State indicated that it would move to admit T.J.'s preliminary hearing testimony. Leech objected, arguing that that testimony was inadmissible hearsay and that the exception set forth in rule 804(b)(1) of the Utah Rules of Evidence was inapplicable. Leech asserted that he did not have the same opportunity and motive to cross-examine T.J. at the preliminary hearing because "it is the practice in this jurisdiction to limit cross-examination at preliminary hearing[s]," given that credibility is not relevant to the probable cause determination. Defense counsel admitted that he "did not pose a question" during his cross-examination of T.J. "that was objected to and . . . sustained," but he maintained that he did not have the same opportunity and motive to cross-examine T.J. as he would have had at trial because he understood the limited scope of the hearing and because he did not have access to additional impeachment material that became available only after the preliminary hearing.

¶29    In response, the State relied on *State v. Brooks*, 638 P.2d 537 (Utah 1981), *superseded by constitutional amendment as stated in State v. Goins*, 2017 UT 61, 423 P.3d 1236, and argued that "the case law is clear" that defense counsel "only had to have the opportunity to cross-examine the witness" for preliminary hearing testimony to be admissible when a witness becomes unavailable at trial because "defense counsel's motive and interest are the same in either setting." (Cleaned up.) The State asserted that preliminary hearings are held "to preserve testimony . . . in case somebody passes [away], in case somebody refuses to testify, and that['s] the nature of this [situation]." The district court agreed with the State and admitted T.J.'s preliminary hearing testimony at trial.

¶30  The jury convicted Leech on all counts. Leech now appeals.

ISSUE AND STANDARD OF REVIEW

¶31  Leech contends that, in admitting T.J.'s preliminary hearing testimony, the district court misapplied rule 804 of the Utah Rules of Evidence. Specifically, he argues that the hearsay exception under rule 804(b)(1) was not satisfied because "Leech did not have a proper opportunity and similar motive to develop [T.J.'s] testimony" on cross-examination during the preliminary hearing.[4] "When reviewing rulings on hearsay, we review legal questions regarding admissibility for correctness, questions of fact for clear error, and the final ruling on admissibility for abuse of discretion." *State v. Garrido*, 2013 UT App 245, ¶ 10, 314 P.3d 1014 (cleaned up). If we determine that the hearsay testimony should not have been admitted, we will reverse "only if a reasonable likelihood exists that absent the error, the result would have been more favorable to the defendant." *State v. Goins*, 2017 UT 61, ¶ 48, 423 P.3d 1236 (cleaned up).

ANALYSIS

I. Admission of Preliminary Hearing Testimony

¶32  Leech contends that the district court erred in admitting T.J.'s preliminary hearing testimony when T.J. refused to testify

---

4. Leech also raises a cumulative error argument, but because Leech asserts only one error on appeal, the cumulative error doctrine does not apply. *See ConocoPhillips Co. v. Utah Dep't of Transp.*, 2017 UT App 68, ¶ 31, 397 P.3d 772 ("[T]he cumulative-error doctrine does not apply when there is only one error demonstrated or assumed on appeal.").

at trial. "Rule 804(b) identifies categories of hearsay that are admissible when a witness is unavailable to testify at trial." *State v. Ellis*, 2018 UT 2, ¶ 35, 417 P.3d 86. The exception in subsection (b)(1) applies where former testimony of a now-unavailable witness

> (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and

> (B) is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Utah R. Evid. 804(b)(1). Leech does not challenge the district court's determination that T.J. was unavailable at the time of trial or that T.J. provided testimony as a witness at the preliminary hearing. He argues that the exception under subsection (b)(1)(B) did not apply because he "did not have an adequate opportunity and similar motive to develop the testimony during the preliminary hearing."

¶33 At the time of Leech's trial, Utah courts routinely admitted preliminary hearing testimony of unavailable witnesses under rule 804(b)(1). *See Ellis*, 2018 UT 2, ¶ 37 (noting that prior precedent allowed preliminary hearing testimony to be admitted at trial). This practice was based on *State v. Brooks*, 638 P.2d 537 (Utah 1981), in which the Utah Supreme Court "announced a per se rule under which preliminary hearing testimony is admissible so long as the requirements of unavailability and an opportunity to cross-examine are satisfied." *State v. Goins*, 2017 UT 61, ¶ 30, 423 P.3d 1236. *Brooks* specifically rejected the argument that Leech makes here—that defense counsel "does not have the same motive and interest to cross-examine at preliminary hearing as he does at trial." 638 P.2d at 541. Instead, the court held that "[d]efense counsel's motive and interest are the same in either setting; he acts in both

situations in the interest of and motivated by establishing the innocence of his client." *Id.*

¶34 But in 2017, about one year after Leech's trial, the Utah Supreme Court held that *Brooks* had been abrogated by a constitutional amendment.[5] Specifically, the court held that "subsequent changes to article I, section 12 of the Utah Constitution undermine one of *Brooks*'s key premises—that '[d]efense counsel's motive and interest are the same in either setting.'" *Goins*, 2017 UT 61, ¶ 31 (quoting *Brooks*, 638 P.2d at 541). In 1994, "Utah voters amended article I, section 12 to limit the function of preliminary examination to determining whether probable cause exists." *Id.* (cleaned up). As a result, "preliminary hearings—at least those that function as the amended constitution envisions—potentially limit the scope of cross-examination such that the blanket statement . . . in *Brooks* no longer rings true." *Id.* ¶ 32. For instance, "[a] defense attorney who assumes that the magistrate will conduct a preliminary hearing that comports with article I, section 12 does not have an incentive to prepare to thoroughly cross-examine on credibility" because such questioning would go "beyond that necessary to establish probable cause." *Id.* ¶ 34. The court concluded that the assumption that defense counsel's motive to cross-examine at a preliminary hearing is the same as at trial "either no longer aligns with the reality of practice, or places magistrates in the uncomfortable position of choosing between conducting

---

5. Even though the district court did not have the benefit of the *Goins* opinion at the time of trial, it governs our resolution of this issue on appeal. New rules of criminal procedure announced in judicial decisions apply to all cases pending on direct review. *State v. Guard*, 2015 UT 96, ¶ 30, 371 P.3d 1. Therefore, Leech "is entitled to the benefit of the *Goins* analysis," *see State v. Ellis*, 2018 UT 2, ¶ 40, 417 P.3d 86, and the State does not argue otherwise.

preliminary hearings in fidelity with article I, section 12 and permitting the type of examinations that *Brooks* presupposes." *Id.*

¶35 Although *Goins* disavowed *Brooks*'s per se rule that the same motive exists to develop testimony at a preliminary hearing and at trial, it stopped short of replacing it "with another blanket rule—one that provides that counsel never has the same motive to develop testimony at a preliminary hearing as at trial." *Id.* ¶ 35. The court recognized that "there may be certain circumstances where the nature of a witness and her testimony is such that defense counsel will ask all the questions at a preliminary hearing that she would ask at trial." *Id.* ¶ 33. However, the court "conditioned the admissibility of preliminary hearing testimony on a showing that 'defense counsel really did possess the same motive and was permitted a full opportunity for cross-examination at the preliminary hearing'—a showing that [the court] conceded 'might prove rare.'" *Ellis*, 2018 UT 2, ¶ 39 (quoting *Goins*, 2017 UT 61, ¶ 36).

¶36 The State contends that this is one of those rare cases. It argues that, because *Brooks* was still good law at the time of the preliminary hearing, defense counsel would have been operating under the assumption that T.J.'s testimony would be admissible at trial if he were later deemed unavailable. According to the State, defense counsel acknowledged as much at the preliminary hearing when he justified a line of questions posed to another witness by explaining that it "may be our only opportunity to cross-examine this witness" because "people tend to not show up." The State further points out that T.J. was cross-examined at length at the preliminary hearing and that defense counsel "did not pose a question that was objected to and . . . sustained." "Given counsel's mindset, the law in effect at the time, the lack of limitations, and the sheer volume of questions," the State asserts that defense counsel had the same motive and opportunity for cross-examination at the preliminary hearing.

¶37 But those observations fail to distinguish this case from *Goins*. Surely, Goins's counsel was also aware that preliminary hearing testimony of an unavailable witness might be admitted at trial pursuant to *Brooks*. But despite notice of that potential risk, the court concluded that "Goins's counsel did not possess the same motive to develop testimony at the preliminary hearing that she would have had at trial." *Goins*, 2017 UT 61, ¶ 46. And, like Leech's counsel, "Goins's counsel cross-examined [the witness at the preliminary hearing] without objection by the State or apparent restriction by the judge." *Id.* ¶ 7. Nonetheless, the court concluded that counsel's motive at trial to develop the testimony and question the witness's credibility "went beyond a preliminary hearing's constitutionally limited purpose." *Id.* ¶ 46. Just as in *Goins*, "[w]ithout *Brooks*'s per se rule, we have no basis to conclude that [Leech's] counsel's preliminary hearing motive to cross-examine was similar to what would have existed at trial." *See id.*

¶38 In fact, the record in this case supports the opposite conclusion. In opposing the admission of T.J.'s testimony at trial, defense counsel explained that he had not cross-examined T.J. at the preliminary hearing about prior inconsistent statements because T.J.'s credibility was not relevant to the probable cause determination. Leech's counsel proffered that he had a "binder of all the statements [T.J.] has made, double sided, . . . and literally not a page goes by where there is not something different than the previous time, or [that] contradicts a later statement." Counsel then explained that he did not attempt to impeach T.J. with these prior inconsistent statements at the preliminary hearing because "Utah case law is very, very clear that credibility is not an issue" at preliminary hearings and is reserved for the trier of fact at trial. But at "an aggravated murder trial where there is almost zero physical evidence," he argued, "[c]redibility is the only issue."

¶39   Moreover, defense counsel represented that he had no opportunity to review the State's supplemental discovery produced just days before the preliminary hearing, which included a new interview with T.J. as well as revised transcripts of his prior statements. Nor did he have access to the supplemental discovery produced in the two years between the preliminary hearing and the trial. Defense counsel indicated that he would have impeached T.J. at trial with inconsistent statements T.J. had made since the preliminary hearing, information gleaned from a recent interview of another witness, and contradictory trial testimony—none of which was available at the time of the preliminary hearing.

¶40   Whether the defense had a similar motive to develop prior testimony for purposes of rule 804(b)(1) will often turn on "the nature of a witness and her testimony." *Goins*, 2017 UT 61, ¶ 31. For example, in arguing this issue before the district court, Leech contrasted T.J.'s preliminary hearing testimony with that of the medical examiner. Leech suggested that the exception in rule 804(b)(1) might more readily apply to a witness like the medical examiner, whose credibility in this case was "a very small or nonexistent issue" and whose testimony—at least in this case—was "somewhat ancillary" to the main issues at trial. In contrast, T.J. was not only a critical eyewitness, but also an accomplice to each of the crimes. The opportunity to cross-examine this type of witness at a preliminary hearing will likely be a poor substitute for confronting the witness at trial, where the jury can observe his demeanor and assess his credibility firsthand. Even if the magistrate permitted cross-examination beyond the scope of the preliminary hearing, the defense may be disinclined to impeach this kind of witness with inconsistent statements or otherwise reveal the defense strategy until the witness takes the stand in front of the jury. And, with such a witness, new cross-examination material is more likely to arise between the preliminary hearing and trial, either as part of the ongoing criminal investigation or as the parties interview

witnesses in preparation for trial. Under circumstances such as these, it is highly unlikely that the State could show that "defense counsel really did possess the same motive and was permitted a full opportunity for cross-examination at the preliminary hearing." *See id.* ¶ 36.

¶41    In this case, the State did not demonstrate that Leech had an adequate opportunity and similar motive to cross-examine T.J. at the preliminary hearing as he would have had at trial. The district court's conclusion to the contrary was based solely on case law that has since been overruled.[6] Therefore, the district court erred in admitting T.J.'s preliminary hearing testimony under rule 804(b)(1).

## II. Harmless Error

¶42    Although the admission of T.J.'s preliminary hearing testimony was error, "not every trial error requires reversal." *State v. Cruz*, 2016 UT App 234, ¶ 41, 387 P.3d 618. "Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded." Utah R. Crim. P. 30(a). Therefore, we must determine whether the erroneous admission of T.J.'s testimony prejudiced Leech. *See State v.*

---

6. Neither *Goins* nor *Ellis* addresses the standard by which an appellate court should review a district court's determination that the defense possessed a similar motive to develop prior testimony within the meaning of rule 804(b)(1). But here, as in *Goins* and *Ellis*, the decision to admit T.J.'s preliminary hearing testimony was predicated on the since-abrogated holding in *Brooks*, which constitutes an error of law. We leave for a future case the question of the appropriate standard of review where the district court finds that the exception in rule 804(b)(1) applies under the legal framework announced in *Goins*.

*McNeil*, 2013 UT App 134, ¶ 51, 302 P.3d 844, *aff'd*, 2016 UT 3, 365 P.3d 699.

¶43 "Prejudice in this setting requires a showing of a reasonable likelihood that the decision to admit [T.J.'s] preliminary hearing testimony altered the jury verdict."[7] *See*

7. Neither party suggests that the evidentiary error in this case was of constitutional dimension, such that the State would bear the burden of persuasion to show that the error was harmless beyond a reasonable doubt. *See State v. Silva*, 2019 UT 36, ¶ 22, 456 P.3d 718 (noting that, for preserved constitutional claims, "the State bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt"). Except in cases of constitutional error, Utah law places the burden on the defendant to prove that a preserved error is harmful. *See State v. Reece*, 2015 UT 45, ¶ 33, 349 P.3d 712 ("[T]he defendant generally bears the burden to demonstrate that the error he complains of affected the outcome of his case."). By placing the burden of persuasion on the defendant, the showing of prejudice required to establish that preserved errors are harmful is indistinguishable from the showing of prejudice required to establish plain error or ineffective assistance of counsel for unpreserved errors.

Other states distinguish between the defendant's burden to show prejudice resulting from an unpreserved error, and the State's burden to show that a preserved error was harmless. *See, e.g., People v. McLaurin*, 922 N.E.2d 344, 355 (Ill. 2009) ("[W]here the defendant has made a timely objection and properly preserved an error for review, the reviewing court conducts a harmless-error analysis in which the State has the burden of persuasion with respect to prejudice."); *State v. Reed*, 737 N.W.2d 572, 583–84 (Minn. 2007) ("Unlike a harmless error analysis, the defendant generally bears the burden of persuasion with respect to the third plain error factor."); *State v. Mueller*, 88 A.3d 924, 928

(continued…)

(…continued)

(N.H. 2014) ("[W]hereas the State bears the burden under harmless error analysis, the defendant bears the burden under the plain error test."); *State v. Nelson*, 587 N.W.2d 439, 443 (S.D. 1998) (explaining that, unlike harmless error review, "in which the State has the burden of proving the error was not prejudicial, with plain error analysis the defendant bears the burden of showing the error was prejudicial"); *State v. Ray*, 216 A.3d 1274, 1278 n.3 (Vt. 2019) ("The State bears the burden of showing that any preserved error is harmless."). But in Utah, except in cases of constitutional error, the State is not required to show that a preserved error was harmless; the defendant is required to show that a preserved error was *not* harmless.

The harmless error doctrine is based on rule 30(a) of the Utah Rules of Criminal Procedure, which provides, "Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded." The United States Supreme Court has interpreted the text of an identically worded federal rule to place the burden on the government to show that a preserved error did not affect the defendant's substantial rights. *See United States v. Olano*, 507 U.S. 725, 734–35 (1993) (explaining that "a court of appeals cannot correct [unpreserved] error unless the defendant shows that the error was prejudicial" under rule 52(b), but "Rule 52(a) precludes error correction only if the error 'does *not* affect substantial rights,'" shifting the burden of persuasion to the government (cleaned up)). We recognize that the Utah Rules of Criminal Procedure do not contain the equivalent of federal rule 52(b), and our supreme court has suggested in passing that "[w]hile the burden of proving an effect on substantial rights under federal rule 52 falls on either the state or the defendant based on whether the error is preserved or unpreserved, rule 30(a) of the Utah Rules of Criminal Procedure is not similarly conditioned on preservation." *State v. Lovell*, 2011 UT 36, ¶ 54, 262 P.3d 803

(continued…)

*State v. Ellis*, 2018 UT 2, ¶ 41, 417 P.3d 86 (cleaned up). To determine whether it is reasonably likely that the outcome of the trial would have been different in the absence of the error, we must "consider a hypothetical—an alternative universe in which the trial went off without the error." *Id.* ¶ 42. In this case, we "assess the likely outcome of a trial in which [T.J.'s] preliminary hearing testimony is eliminated and the jury is left to consider the remainder of the prosecution's case."[8] *See id.*

---

(…continued)
(distinguishing United States Supreme Court caselaw requiring a defendant to show that an unpreserved rule 11 violation affected his substantial rights under rule 52(b) from the showing of "good cause" required when a defendant moves to withdraw his plea based on a rule 11 error), *abrogated on other grounds by State v. Guard*, 2015 UT 96, 371 P.3d 1. However, the Utah Supreme Court may wish to squarely address this issue in a future case. Drawing a similar distinction would encourage defendants to raise objections in the district court when errors can be potentially avoided. *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1349 (2016) (Alito, J., concurring) ("Rule 52 of the Federal Rules of Criminal Procedure treats defendants who preserve their claims much more favorably than those who fail to register a timely objection.").

8. As the Utah Supreme Court has recognized, "[t]his may not be the only way to frame the counterfactual prejudice analysis in a case like this one." *State v. Ellis*, 2018 UT 2, ¶ 42 n.2, 417 P.3d 86. In arguing prejudice, Leech also imagines scenarios in which T.J. testified subject to cross-examination at trial or in which the court granted a continuance to allow the defense to mitigate the impact of T.J.'s refusal to testify. However, because all efforts to compel T.J. to testify had failed and because admission of his preliminary hearing testimony would have been error with or

(continued…)

¶44   In making this determination, we consider the strength of the evidence against Leech on each count and the degree to which the admission of T.J.'s testimony altered the evidentiary picture. Errors involving the improper admission of evidence are often harmless where there is other overwhelming evidence in the record proving the defendant's guilt. *State v. Harvey*, 2019 UT App 108, ¶ 21, 446 P.3d 125. Conversely, we "are more likely to reverse a jury verdict if the pivotal issue at trial was credibility of the witnesses and the errors went to that central issue." *State v. Thompson*, 2014 UT App 14, ¶ 73, 318 P.3d 1221.

¶45   Besides T.J., the middleman was the State's only witness with first-hand knowledge of all the events giving rise to each of the six charges against Leech. Because the middleman's testimony was central to the State's case, Leech's defense focused heavily on attacking the middleman's credibility. The defense argued that the middleman is "an accomplished" and "persistent liar;" "lying is just like breathing" to him. On the stand, the middleman admitted that he had repeatedly lied to law enforcement and had "told them so many stories" he could no longer "remember any of them." He also admitted to other crimes of "dishonesty or false statements."

¶46   The defense argued that the middleman had come forward only to protect himself after he was arrested on an unrelated charge while he was "on the run from the FBI and federal drug distribution charges where he's agreed to cooperate with the FBI but didn't." The middleman confirmed that, before the events at issue in this case, the FBI had agreed not to pursue charges against him in exchange for his cooperation against a

---

(…continued)

without a continuance, we assess prejudice by considering the likely outcome of a trial in which T.J.'s preliminary hearing testimony was properly excluded.

drug cartel. But rather than fulfilling his end of the bargain, he disappeared and continued selling drugs. He also confirmed that, in exchange for his truthful testimony in this case, the State would recommend that he serve no prison time. The defense told the jury that the middleman would do "whatever it takes" to avoid going to federal prison where he would be "labeled a snitch against the cartels" and was willing to "plead guilty to lying to the police about what happened in this case in exchange for his testimony as part of a deal."

¶47    The defense also argued that it was the middleman who had a motive to kill the victim for disappearing with the cash, the rental car, and the drugs stashed in its trunk. The defense maintained that the evidence established only two facts beyond a reasonable doubt: "[The victim] is dead and [the middleman] shot him." According to the defense theory, the evidence showed that the middleman shot the victim not to save his own life, but because he was angry and wanted to send a message that "[n]obody steals from me." The middleman admitted that he had served time in federal prison on racketeering charges and had been a high-ranking member of a white supremacist prison gang. The defense argued that the middleman was "no follower" and took "orders from no one, especially not somebody like Chris Leech."

¶48    By convicting Leech on all charges, the jury presumably rejected these defense arguments and believed at least some portion of the middleman's testimony. But the likelihood of the jury reaching the same conclusion absent the error varies count by count, depending on the degree to which those counts were corroborated by evidence other than T.J.'s testimony. Looking at the complete evidentiary picture, there is a reasonable likelihood of a different result only where the jury was required to credit the middleman's uncorroborated testimony in order to convict. As explained below, Leech has demonstrated prejudice with

respect to the obstruction of justice count, but not with respect to the kidnapping, robbery, and murder counts.

A.     Aggravated Kidnapping and Aggravated Robbery Counts

¶49     With regard to the two aggravated kidnapping and two aggravated robbery counts, there is no reasonable likelihood that the jury would have reached a different verdict if T.J.'s testimony had been excluded. Leech was charged with aggravated kidnapping of both the middleman and the victim. Under the facts of this case,[9] Leech was guilty of aggravated kidnapping if the jury found beyond a reasonable doubt that he used or threatened to use a dangerous weapon in the course of committing an unlawful detention or kidnapping.[10] *See* Utah Code Ann. § 76-5-302(1) (LexisNexis Supp. 2019). Leech was similarly charged with aggravated robbery of both men based on

9. Both the aggravated kidnapping and the aggravated robbery statutes include various aggravating factors, only one of which must be proven beyond a reasonable doubt. We do not list all the aggravators that may be applicable to the facts of this case because the use of a dangerous weapon aggravator is most readily satisfied.

10. To establish the underlying crime of unlawful detention, the State was required to prove that Leech, as a party to the offense, "intentionally or knowingly, without authority of law, and against the will of the victim, detain[ed] or restrain[ed] the victim under circumstances not constituting" kidnapping. *See* Utah Code Ann. § 76-5-304(1) (LexisNexis 2014). As relevant to the facts of this case, the alternative underlying crime of kidnapping required proof that the detention or restraint was for "any substantial period of time" or "in circumstances exposing the victim to risk of bodily injury." *See* Utah Code Ann. § 76-5-301(1)(a)–(b) (LexisNexis Supp. 2019).

emptying their pockets before putting them in T.J.'s truck. Leech was guilty of aggravated robbery if the jury found beyond a reasonable doubt that he used or threatened to use a dangerous weapon in the course of committing a robbery.[11] *See* Utah Code Ann. § 76-6-302(1)(a)–(b) (LexisNexis 2017).

¶50     The admissible evidence supporting these counts was not limited to the middleman's testimony. Instead, the acts satisfying the elements of all four counts took place in front of three additional witnesses, each of whom testified at trial and corroborated the middleman's account. One witness testified to the events that took place at the house; two others testified to the events that took place at the apartment. All three witnesses confirmed that Leech was the "leader of the group," "in control of what was going on," and "the one who told everybody what to do."

¶51     One witness confirmed that the middleman was being held against his will in the house's garage and, when he tried to leave, Leech put a gun to his head, shoved him into the garage, and told him to "[g]et back in the room." The two other witnesses testified that, when the victim finally arrived at the apartment, Leech pointed his gun at the middleman and the

---

11. To establish the underlying crime of robbery, the State was required to prove that Leech, as a party to the offense, unlawfully and intentionally took or attempted "to take personal property in the possession of another from his person, or immediate presence, against his will, by means of force or fear, and with a purpose or intent to deprive the person permanently or temporarily of the personal property" or that Leech intentionally or knowingly used "force or fear of immediate force against another in the course of committing a theft or wrongful appropriation." *See* Utah Code Ann. § 76-6-301(1) (LexisNexis 2017).

victim and ordered them to get down on the ground. Both witnesses confirmed that, at Leech's direction, T.J. tied the victim's and the middleman's hands behind their backs with speaker wire and that Leech took everything out of their pockets, including their cell phones and their wallets. According to both witnesses, Leech zipped up the hooded sweatshirts the two men were wearing, pulled the hoods over their heads, cut a hole in the hoods, and tied the hoods over their faces with speaker wire. Leech then ordered the middleman and the victim to stand up and escorted them outside to T.J.'s truck.

¶52    The testimony of those three witnesses independently supported Leech's aggravated kidnapping and aggravated robbery convictions. Their testimony was consistent not only with the middleman's account of what happened at the house and the apartment, but also with the physical evidence. When police recovered the victim's body, his hands appeared to have been bound with speaker wire and a hole had been cut in the hood of his sweatshirt.

¶53    "We will not overturn a jury verdict for the admission of improper evidence if the admission of the evidence did not reasonably affect the likelihood of a different verdict." *State v. Landon*, 2014 UT App 91, ¶ 3, 326 P.3d 101 (cleaned up). Based on the overwhelming evidence supporting the aggravated kidnapping and aggravated robbery charges, Leech has not demonstrated a reasonable likelihood that he would have attained a more favorable result at trial had T.J.'s prior testimony not been admitted.

B.    Aggravated Murder

¶54    Similarly, there is no reasonable likelihood that the jury would have acquitted Leech of aggravated murder if T.J.'s testimony had been excluded. Leech argues that T.J. "was a critical State witness whose testimony 'provided key pieces of evidence that the jury likely credited' and was necessary for the

State to establish Leech's culpability." (Quoting *State v. Ellis*, 2018 UT 2, ¶ 43, 417 P.3d 86.) To be sure, no evidence besides T.J.'s testimony corroborated the middleman's story that it was Leech who fired the first bullet into the victim's torso or that Leech then ordered the middleman, at gunpoint, to "finish him." As the defense pointed out at trial, the middleman had an interest in deflecting responsibility by claiming that Leech had forced him to shoot the victim. We agree with Leech that, without T.J.'s corroborating testimony, the jury may have had a reasonable doubt as to the veracity of the middleman's self-serving testimony. And, even if the jury believed that the middleman shot the victim to save his own life, the jury had only his word that it was Leech, and not one of the other armed men on the scene, who directed the murder.

¶55 But in attempting to establish prejudice, Leech does not grapple with the fact that he was charged *as a party* to the offense of aggravated murder. To prove his guilt, the State was not required to prove that Leech personally committed the offense. Instead, the State was required to prove only that (1) the offense had been committed; (2) Leech had intentionally, knowingly, or recklessly solicited, requested, commanded, encouraged, or intentionally aided the commission of the offense; and (3) Leech acted with the mental state required for aggravated murder. *See* Utah Code Ann. § 76-2-202 (LexisNexis 2017).

¶56 As to the first element, Leech does not dispute that someone committed the offense. The physical evidence recovered at the scene confirmed that the murder took place in a location and in a manner consistent with what the middleman described. Specifically, it showed that the victim had been bound with speaker wire, taken to a remote location in the mountains near an embankment, and shot once in the torso and once in the head. Indeed, at trial, Leech conceded there were "two things in this case that we know beyond a reasonable doubt"—that the victim is dead and that the middleman shot him. Leech also does

not challenge the jury's finding that the murder was committed under aggravating circumstances.[12] Instead, he argues that there is a reasonable likelihood that the jury would not have believed the middleman's testimony about Leech's role in the murder if T.J.'s testimony had been excluded.

¶57   But for purposes of party liability, the State was not required to prove that Leech personally committed or directed the murder. To establish the second and third elements of party liability, it was enough to prove that Leech aided the commission of the offense with intent to cause the victim's death or knowing the victim's death was reasonably certain to result. Accordingly, Leech's guilt did not turn on whether his actions at the scene of the murder were exactly as the middleman described. Even if someone else had been the principal actor at the time of the murder, it would not have relieved Leech of criminal responsibility so long as the jury found that Leech was liable as a party to the offense. In other words, Leech's guilt did not depend on the jury believing that Leech fired the first shot or that Leech forced the middleman to shoot the victim.

---

12. The jury found multiple aggravating factors, including that the homicide was committed "incident to an act, scheme, course of conduct, or criminal episode during which the actor committed or attempted to commit aggravated robbery, robbery," "aggravated kidnapping, or kidnapping." *See* Utah Code Ann. § 76-5-202(1)(d) (LexisNexis 2017). The evidence regarding the aggravated kidnapping and aggravated robbery counts was overwhelming, *see supra* ¶¶ 49–52, as was the evidence that the homicide occurred during the same criminal episode. Therefore, there is no reasonable likelihood that the jury would have reached a different verdict with respect to the aggravation requirement.

¶58    Without T.J.'s corroborating testimony, the jury might have doubted the middleman's description of what happened on the mountain. But even if the jury had disregarded this uncorroborated testimony entirely, plentiful evidence establishing Leech's guilt as a party to the murder was admitted through the testimony of other witnesses. At the house, Leech pulled a gun on the middleman, held him captive, and announced his intention to shoot both the middleman and the victim when he found him. When the victim returned with the drugs and the rental car, Leech declared that it was "too late" and that the middleman and the victim must "pay for what they did." In front of two other witnesses, Leech solicited the help of two cohorts, both of whom were also armed, to rob and kidnap the middleman and the victim. Leech incapacitated the two men by ensuring that they were bound and blindfolded, their pockets emptied, and their shoes removed. Then he ordered T.J. and Juice to help him take the men into the mountains to be taught a lesson.

¶59    Even if the jury harbored reasonable doubts about some of the details of what happened after that point, the second and third elements of party liability had already been established. As to the second element, the overwhelming evidence established that Leech intentionally, knowingly, or recklessly "solicited, requested, commanded, encouraged, or intentionally aided the commission of the offense" of aggravated murder when he held the middleman and the victim at gunpoint and enlisted the help of T.J. and Juice to incapacitate the two men, remove any identification from their pockets, and force them into T.J.'s truck to be taken to a remote location.

¶60    As to the third element, the evidence overwhelmingly established that Leech had the mental state required for aggravated murder because he intentionally or knowingly caused the victim's death. *See* Utah Code Ann. § 76-5-202(1) (LexisNexis Supp. 2019). Intent is rarely subject to direct proof

and must generally be inferred from the actions of the defendant and the surrounding circumstances. *State v. Florez*, 2020 UT App 76, ¶ 18, 465 P.3d 307. But, in this case, the State offered evidence that Leech actually voiced his intention to shoot both the middleman and the victim. Other witnesses who observed Leech's behavior similarly understood that he intended for the two men to die. Even when Leech tried to reassure Juice's wife that he was planning only to make the hapless drug dealers walk barefoot down the mountain, she understood Leech's intentions to be murderous and did not believe that anyone other than Leech was "coming back."

¶61    At the very least, the overwhelming evidence established that Leech knowingly caused the victim's death because he was aware that his conduct was reasonably certain to cause that result. *See* Utah Code Ann. § 76-2-103(2) (LexisNexis 2017). In the presence of multiple witnesses, Leech recruited two other armed men to help him, incapacitated the middleman and the victim, and directed that the bound and blindfolded men be taken off-site to pay for what they did. Even if the jury had a reasonable doubt as to what exactly happened after the men left the apartment, the overwhelming evidence established that Leech initiated the events leading to the murder knowing that the victim's death was at least reasonably certain to result.

¶62    Because Leech's conduct before leaving the apartment established the second and third elements of party liability, his conviction for aggravated murder did not depend on the veracity of the middleman's account of the murder itself. The only remaining element—that the crime Leech set in motion was thereafter committed—was not disputed at trial. Accordingly, there is no reasonable likelihood that the erroneous admission of T.J.'s corroborating testimony changed the result, making the error harmless as to Leech's aggravated murder conviction.

C.     Obstruction of Justice

¶63     In contrast, the obstruction of justice charge could not be proven without crediting the middleman's testimony. And there is a reasonable likelihood that the jury would not have believed the middleman without the corroboration T.J.'s testimony provided. To convict Leech of obstruction of justice, the jury was required to find that Leech "altered, destroyed, concealed or removed any item or other thing"—or intentionally, knowingly, or recklessly "solicited, requested, commanded, encouraged, or intentionally aided another" to do so—with the specific intent to "hinder, delay, or prevent the investigation, apprehension, prosecution, conviction, or punishment of any person" for the crimes charged. *See* Utah Code Ann. § 76-8-306 (LexisNexis 2017) (obstruction of justice); *see also id.* § 76-5-202 (party liability).

¶64     The State's case that Leech had obstructed justice relied heavily on T.J.'s testimony. T.J. testified that Leech took T.J.'s gun and said he would "get rid of" it, that Leech told T.J. to get rid of his clothes, and that Leech told Juice to burn the middleman's clothes and T.J.'s boots. If that testimony had been properly excluded, the only remaining evidence relating to the obstruction counts would have been the middleman's testimony. T.J.'s improperly admitted testimony significantly altered the entire evidentiary picture by substantiating the middleman's account. Without the corroboration offered by T.J.'s prior testimony, there is a reasonable probability that the middleman's testimony alone would not have convinced the jury of Leech's guilt beyond a reasonable doubt. The likelihood of such a result is sufficient to undermine our confidence in the verdict with respect to the obstruction count.

¶65     The State contends that Leech cannot show prejudice because T.J.'s testimony was merely cumulative, noting that all the facts necessary to support the jury's verdict can be gleaned from the record even if T.J.'s testimony is excluded. This

argument fails to recognize the important distinction between analyzing the sufficiency of the evidence supporting a conviction and assessing prejudice stemming from the improper admission of evidence. *See United States v. Lane*, 474 U.S. 438, 450 n.13 (1986) (agreeing "that the harmless-error inquiry is entirely distinct from a sufficiency-of-the-evidence inquiry").

¶66    In the counterfactual scenario where T.J.'s testimony had been properly excluded, we agree with the State that the remaining evidence would have been sufficient to prove Leech's guilt beyond a reasonable doubt. The middleman testified that Leech said that he would "take care of the guns"; instructed T.J. to detail his truck; and told the middleman to change out of his clothes, leave them outside the bathroom, and keep looking for the victim as if "nothing happened." That testimony alone would have been sufficient to convict Leech of obstruction of justice.

¶67    But the prejudice analysis does not depend on whether the properly admitted evidence would have been sufficient to sustain the conviction; rather, we consider whether, in the absence of the improperly admitted evidence, the likelihood of a different outcome is sufficiently high to undermine our confidence in the verdict. *See State v. Knight*, 734 P.2d 913, 920 (Utah 1987). In this case, the middleman's testimony standing alone, if believed, would have been sufficient to support the jury's verdict on the obstruction of justice count, and Leech does not claim otherwise. But if the middleman's story had not been corroborated by T.J., the defense could have more effectively exploited the middleman's lack of credibility and possible motive in covering up his own actions. If the only account of what had happened after the murder had been provided by a person who admittedly shot the victim, it is reasonably likely that the jury would have had reasonable doubt regarding Leech's guilt on the obstruction of justice count.

¶68 The State resists this conclusion by arguing that, because the evidence showed that Leech "was in charge leading up to the murder," it would "come as no surprise" that he "would retain his position afterward and direct the cover up." To be sure, the testimony of the other witnesses paints a picture of Leech calling the shots from the moment he arrived at the house up until he left the apartment in T.J.'s truck. This evidence is consistent with the middleman's testimony that Leech continued to assert control and ultimately directed the subsequent obstruction of justice.

¶69 But unlike the murder, which indisputably happened, without T.J.'s testimony, the jury had only the middleman's word that any obstruction of justice occurred. The State presented no other admissible evidence to prove that anyone had "altered, destroyed, concealed, or removed any item or other thing," let alone that Leech had directed or otherwise participated in that offense with the specific intent to obstruct justice. While the jury might have credited the middleman's story even without T.J.'s corroborating testimony, the likelihood that T.J.'s testimony tipped the scales is sufficient to undermine our confidence in the verdict on the obstruction of justice count.

CONCLUSION

¶70 We conclude that T.J.'s prior testimony was inadmissible hearsay, and that the exception set forth in rule 804(b)(1) of the Utah Rules of Evidence is inapplicable because the defense did not have the same opportunity and motive to cross-examine T.J. at the preliminary hearing as it would have had at trial. The district court therefore erred in admitting that testimony. This error did not prejudice Leech's defense with respect to the kidnapping, robbery, and murder counts, but there is a reasonable likelihood that Leech would not have been found guilty of obstruction of justice absent the error.

¶71 Accordingly, we affirm Leech's convictions for two counts of aggravated kidnapping, two counts of aggravated robbery, and one count of aggravated murder. We vacate Leech's conviction for obstruction of justice and remand to the district court for further proceedings.

―――――――