**2023 UT App 65**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ELIZABETH LYDIA MEYER,
Appellant.

Opinion
No. 20210718-CA
Filed June 15, 2023

First District Court, Brigham City Department
The Honorable Spencer Walsh
No. 181100556

Wendy M. Brown, Debra M. Nelson, and
Benjamin Miller, Attorneys for Appellant

Blair T. Wardle, Attorney for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

MORTENSEN, Judge:

¶1     Elizabeth Lydia Meyer's[1] ex-husband (Father) discovered bruising on their daughter (Child) after picking her up from Meyer's home. The State charged Meyer with child abuse and, at a bench trial, used a process-of-elimination approach to argue that Meyer was the only possible cause of the bruising. The district court convicted Meyer, and she now appeals. Meyer asserts that the court erred in admitting the preliminary hearing testimony of

---

1. Since the time of her charges, the defendant has remarried. She uses a different last name but still accepts the use of "Meyer." We continue to use "Meyer" for simplicity and for consistency with the case name.

her now-husband. We agree that this action was erroneous and prejudiced Meyer, so we vacate her conviction.

BACKGROUND

¶2    One Wednesday in July 2018, Father picked up Child, then two years old, from Meyer's home for a regular midweek visit. Meyer and Father had been through a "fairly contentious" divorce, and their relationship was sometimes "volatile," so Father had made it a habit to record via cellphone his pickups of Child. His video recording from this day shows marks on the upper portions of both of Child's arms. But Father did not notice the marks until later, when he was at a restaurant with Child. Father exchanged texts with Meyer about the marks:

> Father:   I noticed that [Child] has what looks like bruises on her arm. Is she okay?
>
> Meyer:   Yes, she's fine.
>
> Father:   How did she get those marks?
>
> Meyer:   How do children get the majority of their bruises? What direction are you trying to go with this?
>
> Father:   I'm just concerned because the bruising pattern is not consistent with normal childhood injuries.
>
> Meyer:   Since when did you become an expert in that matter? I understand that you want to pretend to care about my daughter, but I do not wish to have you go on a third witch hunt and falsely accuse someone like you already have done twice, even

though we both know you're dying to. You do not make any of her medical appointments. And the last I knew you have not completed any courses in the direction. So please leave your harassing comments to yourself.

¶3 After dinner, Father drove to the police station and asked for an officer to examine Child's arms. An officer (Officer) and a caseworker (Caseworker) from the Division of Child and Family Services (DCFS) met with Father and photographed Child's arms approximately two hours after Father had picked up Child.

¶4 Officer and Caseworker then visited Meyer's home. Outside, they met Michael Glenn, Meyer's then-boyfriend whom she married before the case went to trial. Glenn was initially "defiant" and did not want them to enter the house, but when they showed him photos of Child's bruises, he was concerned and let them in.

¶5 Officer and Caseworker entered the house and spoke with Meyer, who was very upset. Officer asked Meyer what could have caused bruising on Child's arms, and Meyer gave multiple possible explanations, including Child falling out of the car when she arrived home from daycare, Child playing with hair ties that were like rubber bands (which she snapped on her arms), or Child playing roughly with her older brother and sometimes getting rug burns from the roughhousing. Caseworker asked Meyer how she had picked Child up when Child fell out of the car after returning from daycare, and Meyer responded along the lines that she picked Child up like any mother would and cleaned her face. Meyer also reported that she had caused a mark on Child's upper arm when Child ran into the street and Meyer pulled her back. Caseworker showed Meyer photos of Child's bruises, and Meyer was very surprised, saying, "They were not like that."

¶6     Glenn gave Officer contact information for Child's daycare provider (Daycare Provider). When Officer spoke to Daycare Provider on the phone, she confirmed that Child had been in her care that day. Daycare Provider also confirmed that she had asked Meyer about a mark on Child's arm when Meyer picked Child up that day and that Meyer told her she had grabbed Child to prevent her from running into the street.

¶7     The next day, Father took Child for a physical exam, which was completed by a forensic nurse examiner (Nurse). In her report, Nurse identified "[p]ositive physical findings of injury to bilateral upper arms and left forearm" and described the upper arm injuries as "circumferential and linear with equal spacing between" them and stated that the bruises were "highly indicative for a squeezing mechanism and physical abuse." Child was not returned to Meyer's care.

¶8     The case was transferred to a detective (Detective), who called Meyer two days after the alleged incident and recorded the phone call. During the call, Meyer implied that Father was the source of Child's bruises because, according to her, Child had no bruises until she was in Father's care and Meyer believed that "[h]e [was] trying to get [her] daughter away from [her]." Meyer was very upset during the call and indicated that she had been previously accused of child abuse, presumably by Father. Meyer also stated that she did not see any bruises or marks on Child—other than the mark from the incident she reported of grabbing Child to stop her from running into the road—before giving Child to Father. But she explained that Child would sometimes scratch herself, leaving marks, and hit and bite things. Meyer also spoke about Glenn's whereabouts on the day of the incident, indicating that Glenn was asleep when Child came home and remained asleep until after Father had picked Child up.

¶9     Detective wrote in his police report that Child's older brother, then four years old, "was asked where his sister got the

marks on her arm and he said that it was from someone who had power and squeezed hard." Detective spoke to Daycare Provider, though he did not inspect her home; perform a background check on her; or speak with the parents of other children she babysat or with the three children she had living with her, who were ages fourteen, ten, and eight and may have had access to Child. Detective later testified that he didn't really consider Daycare Provider a suspect after speaking with her. He also ruled out Glenn as a suspect based on Meyer's statement that Glenn had been asleep between the time Child came home from daycare and the time Father picked up Child. However, in his report he wrote that he told Meyer he didn't think the incident causing the bruising had happened on that day. But at trial he testified that, based on his investigation, the timeline he established was that there were no visible bruises—other than the one caused by Meyer stopping Child from running into the street—until the time between Meyer picking Child up from daycare and Father picking her up from Meyer within the next forty-five minutes.

¶10    In August 2018, another officer (Sergeant) interviewed Meyer in person at Detective's request. Meyer's statements were consistent with those she had made previously. Specifically, Meyer again stated that Glenn was asleep when Child returned from daycare and did not wake up until after Child left with Father.

¶11    In December 2018, the State charged Meyer with one count of child abuse, a class A misdemeanor.

¶12    The district court held a preliminary hearing in May 2019. Among other witnesses, the State subpoenaed Glenn to testify at the hearing. When he was called to testify, he was hostile, and the court threatened to hold him in contempt and take him into custody. But Glenn ultimately did testify. While he first declared that it was "100 percent incorrect" that he told Officer and Caseworker that the marks had not been on Child in the morning,

after reviewing Officer's bodycam footage, he admitted that he did say that. He also testified that after waking up that morning, he went straight to the car and didn't notice any marks on Child's arms, but he said he was busy "concentrating on driving and getting to and from." He described how he went with Meyer to drop Child off at daycare in the morning. He testified that he was asleep when Meyer brought Child home. And he declared that he did not cause Child's bruising.

¶13   Sometime after the preliminary hearing, Meyer married Glenn, and Meyer's defense counsel (Defense Counsel) informed the State via email that Glenn intended to invoke his spousal privilege related to testifying at trial. The State told Defense Counsel that Glenn was "still required to show up to court to produce evidence that he [was], in fact, married . . . and take the stand to actually invoke the privilege." The prosecutor insisted, "This is important because then he will become an unavailable witness. As an unavailable witness, I will then be able to play his preliminary hearing audio in lieu of his testimony." Defense Counsel indicated that she "had anticipated that [the State] would be able to get Glenn's preliminary hearing testimony in at trial."

¶14   When Defense Counsel later informed the State that Glenn would be on bed rest following surgery on the date of trial (which had been continued multiple times), they discussed the possibilities of Glenn testifying via video during trial or of filing stipulated facts related to his testimony. But Glenn filed a motion to quash the subpoena against him. The State then sent Defense Counsel a transcript and redacted audio file of Glenn's preliminary hearing testimony that it intended to have admitted at trial, and Defense Counsel responded, "I would absolutely object to both the transcript and the audio coming in at trial. . . . Glenn's testimony is hearsay[,] and to introduce it would also be a violation of my client's confrontation rights." Defense Counsel explained, "The Utah Supreme Court has ruled that because there

is a different motive for examining witnesses at a preliminary hearing than that at a trial, said testimony is inadmissible."

¶15 The State then filed a motion to admit Glenn's preliminary hearing testimony. After receiving briefing and hearing oral argument, the court found that Glenn's testimony fell under the exception to hearsay in rule 804(b)(1) of the Utah Rules of Evidence for former testimony of an unavailable witness. The court acknowledged caselaw indicating that defendants are restricted in developing testimony at preliminary hearings, *see State v. Goins*, 2017 UT 61, ¶¶ 32–33, 423 P.3d 1236, but it distinguished that caselaw from the facts of this case and admitted the testimony.

¶16 The court held a bench trial in May 2021. In its opening statement, the State indicated that "through the process of elimination," it would "show beyond a reasonable doubt that it was . . . Meyer who committed child abuse."

¶17 In addition to Glenn's testimony, Daycare Provider testified at trial that Child had been in her care from roughly 9:00 a.m. to 4:45 p.m. that day. She stated that she did not see any marks or injuries on Child when Child was dropped off and she never saw marks like those photographed, but she did notice a different mark on Child's arm later in the day, and this was the mark she asked Meyer about. She also testified that on the day of the bruising, she did not take Child to the park, she did not know of any equipment Child could have accessed that would have caused the injuries, Child did not get injured playing with toys, Child did not receive any injuries while in her care, and Child did not cry or appear to be in pain while in her care. She admitted, though, that she was aware that Child had been "kicked out of her previous day care . . . for playing too rough" and that Child "play[ed] really rough with toys and hit[] dolls a lot."

¶18 Nurse testified that after examining Child, she "speculated . . . that because of the spacing, and the shape, and the location of

the injuries, the colors that [she] saw, they were most definitely bruises," the spacing of which "could fit a hand." She said, "I'm not telling you it's fitting a hand because—you know, I can't say it was a hand unless I watched it happen, but I can tell you that those are bruises that are in a linear form that you don't just get from falling down." She further testified that based on the location, direction, and shape of the bruising, she did not believe that the incidents Meyer had described as possible accidental sources of injury had caused Child's bruises. She also testified that the marks were "fresher bruises" that, based on coloration, could have been caused within hours of when Officer and Caseworker photographed Child's injuries. But she acknowledged that "there's no scientific way to date a bruise" and said that while it was "likely that it occurred" that day, "literally there is no way to determine when it happened."

¶19    The State played a clip from the recorded interview between Meyer and Sergeant, in which Meyer stated that Child had a temper tantrum after arriving home from daycare and that Child tried to get out of being held and Meyer needed to grab her arm from the side.

¶20    In its closing argument, the State asked, "[W]ho caused the abuse?" and answered that "this is where we get into the process of elimination." The State then explained its theory that the evidence proved that no one else could have caused the bruising, including Glenn, who "slept through the whole thing."

¶21    The court ultimately found Meyer "guilty of a lesser-included offense of [c]lass B misdemeanor, child abuse, for having inflicted this injury on [Child] in a reckless manner." The court provided its rationale, explaining in part that it "found highly credible the testimony" of Nurse that the "bruising was consistent with the types of bruising she has seen in her child abuse conferences and trainings." The court ruled out Glenn as a potential source of the injuries by saying, "You know, . . . Glenn

is asleep by the time [Child] gets home and doesn't really interact at all. And then we know for a fact that the injuries took place . . . definitively prior to when [Father] arrive[d] based off of the video." The court concluded, "And so there's just no doubt in the [c]ourt's mind that Mom, you lost your cool, you crossed a line, you squeezed your daughter's arms, and it left that injury. It couldn't have been anyone else." The court sentenced Meyer to 180 days of jail but suspended 179 days. It also ordered a fine and probation.

¶22    Meyer subsequently filed a motion for a new trial through Defense Counsel. Defense Counsel then withdrew from representing Meyer. Meyer appeared pro se and asked the court to appoint counsel, but the State objected, and the court decided that Meyer did not qualify for appointed counsel based on her income. The court ultimately denied Meyer's motion for a new trial. Meyer now appeals.

ISSUE AND STANDARD OF REVIEW

¶23    Meyer argues on appeal that Glenn's "preliminary hearing testimony should not have been admitted at trial" under an exception to the bar on hearsay.[2] "When reviewing rulings on hearsay, [appellate courts] review legal questions regarding admissibility for correctness, questions of fact for clear error, and the final ruling on admissibility for abuse of discretion." *State v. Leech*, 2020 UT App 116, ¶ 31, 473 P.3d 218 (cleaned up), *cert. denied*, 481 P.3d 1039 (Utah 2021). But even "if we determine that the hearsay testimony should not have been admitted, we will reverse only if a reasonable likelihood exists that absent the error,

---

2. Meyer also argues that the district court "committed plain error by failing to obtain a valid waiver of counsel before having [Meyer] represent herself on her motion for a new trial." Because we rule in her favor on the first issue, we need not address this argument.

the result would have been more favorable to the defendant." *Id.* (cleaned up).

## ANALYSIS

### I. Similar Motive and Opportunity

¶24    Meyer argues that the district court erred in admitting Glenn's preliminary hearing testimony. She asserts that Glenn's testimony fails to qualify for the rule 804 exception to the evidentiary bar on hearsay. This exception applies when "the declarant is unavailable" and the declarant's testimony was "given . . . at a trial, hearing, or lawful deposition" and is now "offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Utah R. Evid. 804(b)(1). Meyer argues that caselaw on this point "compels the conclusion that the admission of Glenn's preliminary hearing testimony was erroneous" because that caselaw indicates that the motive to develop an adverse witness's testimony at a preliminary hearing differs from the motive to do so at trial.

¶25    In *State v. Goins*, 2017 UT 61, 423 P.3d 1236, our supreme court discussed the effect of the 1994 amendment to Article I, Section 12 of the Utah Constitution, which limited "the function of preliminary examination to determining whether probable cause exists," *id.* ¶ 31 (cleaned up) (discussing Utah Const. art. I, § 12). The court stated that, "by and large," this provision "places most credibility determinations outside the reach of a magistrate at a preliminary hearing." *Id.* ¶ 33. Therefore, "[o]ur constitution specifically limits the purpose of preliminary hearings in a manner that can undercut defense counsel's opportunity to cross-examine witnesses at a preliminary hearing and thereby modify the interest counsel has in developing testimony on cross-examination." *Id.* ¶ 41. But the court "eschewed a blanket rule" of inadmissibility for preliminary hearing testimony because it

could "envision scenarios where, for whatever reason, defense counsel possesses the same motive and is provided the same opportunity to cross-examine as she would have at trial." *Id.* ¶¶ 36–37. However, the court indicated that "such cases might prove rare." *Id.* ¶ 36.

¶26 The *Goins* court then analyzed the motive for cross-examining a witness at the preliminary hearing by considering the facts of the case, which included the defendant allegedly brandishing a knife and accusing the later-unavailable witness of stealing his phone, after which the witness fled and the defendant assaulted the witness's acquaintance. *Id.* ¶¶ 3–6. The court held that it was "apparent on the record . . . that [the defendant's] counsel did not possess the same motive to develop testimony at the preliminary hearing that she would have had at trial" because the witness's "testimony referenced concerns with [the defendant] and a prior incident between" the pair, so the defendant's "counsel had a motive to develop this testimony and question [the witness's] credibility" at trial "that went beyond a preliminary hearing's constitutionally limited purpose." *Id.* ¶ 46.

¶27 Subsequent cases have reached similar conclusions. In *State v. Ellis*, 2018 UT 2, 417 P.3d 86, a defendant faced a charge of aggravated robbery for allegedly robbing a cupcake shop at gunpoint, *id.* ¶¶ 1, 4. The store clerk testified at trial as to the events within the store, *id.* ¶ 19, but another witness—a witness who saw the perpetrator leave the scene, run across the road, and get into a car whose license plate she then reported—was not able to be in court on the day of the trial, *id.* ¶¶ 7–8, 16. The court admitted her preliminary hearing testimony, *id.* ¶ 19, but our supreme court held that this was improper, *id.* ¶ 40. It stated that in *Goins,* it had "conditioned the admissibility of preliminary hearing testimony on a showing that defense counsel really did possess the same motive and was permitted a full opportunity for cross-examination at the preliminary hearing." *Id.* ¶ 39 (cleaned up). And it said that "*Goins* foreclose[d] the admissibility of the

. . . preliminary hearing testimony" because, "as in *Goins*, . . . [the court had] no basis to conclude that [the defendant's] counsel's preliminary hearing motive to cross-examine was similar to what would have existed at trial." *Id.* ¶ 40 (cleaned up).

¶28    Similarly, in *State v. Leech*, 2020 UT App 116, 473 P.3d 218, *cert. denied*, 481 P.3d 1039 (Utah 2021), this court applied the holding of *Goins* where a defendant faced charges related to the alleged kidnapping of two men and murder of one of them, *id.* ¶¶ 22–24. The court considered the admissibility of preliminary hearing testimony from a man who helped tie up the victims, drove the group to the murder site, supplied the gun, and observed the murder. *Id.* We noted that "whether the defense had a similar motive to develop prior testimony for purposes of rule 804(b)(1) will often turn on the nature of a witness and her testimony." *Id.* ¶ 40 (cleaned up). Where the witness in question "was not only a critical eyewitness, but also an accomplice to each of the crimes," we determined that "[t]he opportunity to cross-examine this type of witness at a preliminary hearing will likely be a poor substitute for confronting the witness at trial, where the jury can observe [the witness's] demeanor and assess . . . credibility firsthand." *Id.* Accordingly, we held that "the State did not demonstrate that [the defendant] had an adequate opportunity and similar motive to cross-examine [the witness] at the preliminary hearing as he would have had at trial." *Id.* ¶ 41.

¶29    The district court believed that the present case was distinguishable from *Goins* because that case involved an "incident that could have caused motive for [the witness] to fabricate or fashion . . . testimony in such a way that would be damaging to [the defendant]." *See Goins*, 2017 UT 61, ¶ 46. On the other hand, the court stated, "in the case before the [c]ourt, there's nothing that has been pointed to specifically that would indicate that there is a similar motive for . . . Glenn to have fabricated any of his testimony." But the court's analysis on this point was inadequate, as a witness's motive for fabrication is not the only

circumstance that might impact a defendant's motive for questioning a witness at a preliminary hearing. This is obvious from *Ellis*, where the witness had no motive to fabricate testimony and our supreme court still held that it had "no basis to conclude that [the defendant's] counsel's preliminary hearing motive to cross-examine was similar to what would have existed at trial." 2018 UT 2, ¶ 40 (cleaned up).

¶30 The district court erred in concluding that the motives at the preliminary hearing and at trial were the same. The court stated that during the preliminary hearing "there was an opportunity to cross-examine [Glenn] as to whether he was the source of . . . the injuries, whether he abused [Child]." "In fact," it pointed out, "the State specifically questioned him on that." It continued, "[The preliminary hearing judge] would have never shut that down and said, 'No, even though the State had questioned specifically, did you cause the injuries, [d]efense you're prohibited from going after him to follow up on that question.' Certainly that would have been permitted by . . . the [j]udge." But this analysis does not align with our supreme court's in *Goins*. The *Goins* court specifically addressed the reality that a per se rule of admissibility for preliminary hearing testimony of unavailable witnesses "places magistrates in the uncomfortable position of choosing between conducting preliminary hearings in fidelity with article I, section 12 and permitting the type of examinations" that were standard before the constitutional amendment limited the scope of preliminary hearings. 2017 UT 61, ¶ 34. The district court fails to accept that, as the supreme court suggests, Defense Counsel could have reasonably expected the court to limit questioning to that which was necessary for probable cause and prepared to cross-examine Glenn accordingly. *See id.* We reasoned similarly in *Leech*, where the defendant's "counsel admitted that he did not pose a question during his cross-examination of [the witness] that was objected to and sustained, but he maintained that he did not have the same opportunity and motive to cross-examine [the witness] as he

would have had at trial because he understood the limited scope of the hearing." 2020 UT App 116, ¶ 28 (cleaned up). Accordingly, the district court erred in determining that Meyer had the same motive and opportunity to question Glenn in the preliminary hearing as she did at trial because the judge would—presumably—not have prevented follow-up questions to those that were asked.

¶31 Instead, the court should have recognized that the motives changed with respect to questioning witnesses at the preliminary hearing versus at trial. The State was clear that its case was based on a process of elimination. This point is hardly significant at a preliminary hearing, which seeks to determine if there was probable cause—a low standard—for a jury to conclude Meyer caused the bruising. *See id.* ¶ 20 (reciting the magistrate's explanation at the defendant's preliminary hearing that "different standards of proof apply at a probable cause hearing than apply at trial" and that "probable cause means enough evidence that the court is convinced that a reasonable jury could find, not that they necessarily would, but that they could find the offenses charged were committed and that [the defendants] were the individuals who committed them" (cleaned up)). Moreover, at a preliminary hearing, the facts are construed in the light most favorable to the State's case. *See id.* (indicating that the magistrate informed the defendant that "one of the most important [differences] is that any doubts or questions about evidence at a preliminary hearing get resolved in favor of the State and against the defendants" and explained that "the benefit of the doubt goes to the State in a preliminary hearing" (cleaned up)). On the other hand, at trial the State must prove a defendant's guilt beyond a reasonable doubt, *see, e.g., id.* ¶ 64, and here the State needed to eliminate all other possible suspects beyond a reasonable doubt during trial. So the motive in questioning each witness at the preliminary hearing was to show lack of probable cause that Meyer was the source of Child's bruises, while the motive at trial was to introduce reasonable doubt as to Meyer causing the bruises by convincing

the court that someone else may have done so. In other words, with respect to Glenn, the motive shifted from showing that Glenn was the more likely source of the bruising to showing that Glenn could have caused the bruising such that there was reasonable doubt that Meyer caused it. Therefore, we hold, as did the *Goins* court, that it was "apparent on the record . . . that [Meyer] did not possess the same motive to develop testimony at the preliminary hearing that she would have had at trial" because at trial Meyer "had a motive to . . . question [Glenn's] credibility that went beyond a preliminary hearing's constitutionally limited purpose." *See* 2017 UT 61, ¶ 46.

## II. Prejudice

¶32 "A determination of error in admitting [Glenn's] preliminary hearing testimony is not alone enough to sustain a reversal. We must also find that error prejudicial. Prejudice in this setting requires a showing of a reasonable likelihood that the decision to admit [Glenn's] preliminary hearing testimony altered the . . . verdict." *See State v. Ellis*, 2018 UT 2, ¶ 41, 417 P.3d 86 (cleaned up).

¶33 The relevant caselaw indicates that errors in admitting preliminary hearing testimony are sometimes harmless. In *Goins*, the court held that the error was prejudicial as to one charge but harmless as to another because on the first charge, the "testimony was the primary evidence admitted in support of" that charge but on the second charge, the testimony did not address the major underlying facts and the guilty verdict was supported by other witness testimony and corroborating photographs. *State v. Goins*, 2017 UT 61, ¶¶ 50–51, 423 P.3d 1236.

¶34 Similarly, in *Leech*, this court identified prejudice with respect to one count but not as to three others. *State v. Leech*, 2020 UT App 116, ¶ 48, 473 P.3d 218, *cert. denied*, 481 P.3d 1039 (Utah 2021). For the first, we determined that the "charge could not be proven without crediting" the testimony of the kidnapping victim

who wasn't killed and "there [was] a reasonable likelihood that the jury would not have believed" this person "without the corroboration [the unavailable witness's] testimony provided." *Id.* ¶ 63. But we held that two of the convictions were independently supported by three other witnesses. *Id.* ¶ 52. And for the final charge, one of its elements "was not disputed at trial" and the other two elements "did not depend on the veracity of the [unavailable witness's] account of the murder itself." *Id.* ¶ 62.

¶35　In *Ellis*, the court found prejudice where "the preliminary hearing testimony in this case was central to the prosecution's case on this charge." 2018 UT 2, ¶ 2. The court so concluded because the witness "provided key pieces of evidence that the jury likely credited," including her being "the only witness who could testify that the robber fled in a car"—making her "the crucial link for what occurred after [the clerk] lost sight of the robber." *Id.* ¶¶ 43, 45.

¶36　Here, the court's error in admitting Glenn's testimony prejudiced Meyer because there is a "reasonable likelihood that the decision to admit [Glenn's] preliminary hearing testimony altered the . . . verdict." *See id.* ¶ 41 (cleaned up). The State's presentation of the case against Meyer as a "process of elimination" impacts the fact-finder's weighing of the evidence such that, for Glenn's testimony to have been prejudicial, Meyer need show only that without the testimony, the court would have had a reasonable doubt that she was the source of the injuries. Meyer points us to this helpful insight offered by the Supreme Court of Illinois: "[I]f [the prosecution] intend[s] to obtain a conviction by the process of elimination by showing that no one else but [the] defendant could have been guilty, the burden [is] upon it to show that there was no one else in the other room." *People v. Boyd*, 161 N.E.2d 311, 315 (Ill. 1959).

¶37　We agree with Meyer that removing Glenn's erroneously admitted testimony makes a finding of reasonable doubt as to

Meyer's guilt much more likely. While Meyer's own testimony corroborated Glenn's account from the preliminary hearing that he was sleeping during the time Child was home from daycare until Father picked her up, that is not the only information Glenn provided. Glenn also testified that he did not cause the bruising. And he testified that, on the morning in question, he woke up and went directly to the car to drive Child to daycare, giving him no opportunity to interact with Child such that he could have caused her bruising that day.

¶38 The court, in providing the rationale for its conviction of Meyer, explained that it "found highly credible the testimony of" Nurse that the "bruising was consistent with the types of bruising she has seen in her child abuse conferences and trainings." And it said, "You know, . . . Glenn is asleep by the time [Child] gets home and doesn't really interact at all. And then we know for a fact that the injuries took place . . . definitively prior to when [Father] arrive[d] based off of the video." The court clearly found that the bruises were caused before Father arrived, but it did not make a specific finding that the bruises could not have been caused earlier in the day. And Nurse, whose testimony the court found "highly credible," testified multiple times that she could not provide a timeline for the cause of the bruising. When asked if it was "possible to at least rule out certain time frames," Nurse responded, "What we were trained was that a fresher bruise is red or purple. . . . Red or purple means that this happened probably fairly close to the time that I saw her because of the darkness of the color, but . . . there's no scientific way to date a bruise." Nurse agreed that the bruises could have been caused "within hours." But when Defense Counsel pressed, asking, "You testified a minute ago that you—it's your opinion that with bruising, from what you observed, it's more likely that it occurred like four hours before?" Nurse answered, "That day." Defense Counsel stated, "That day. Two hours before, five hours before." Nurse responded, "Purple-red is the colors you see first with bruising

and there is—literally there is no way to determine when it happened."

¶39 Given that removing Glenn's testimony would have heightened the possibility that Glenn caused the injuries at some time outside the window between Child's return from daycare and Father's arrival, we conclude that Meyer was prejudiced. The State's process-of-elimination approach makes Glenn's preliminary hearing statements that he did not cause the bruising and did not have the opportunity to cause the bruising before Child went to daycare all the more significant. The State admitted as much when it argued for the admission of Glenn's testimony, saying that "his testimony [was] necessary to the State to prove the case at trial." We are hard-pressed to conclude that the testimony's faulty admission was harmless when the State was so adamant that the testimony was essential in the first place. And the State fails to argue that Meyer was not prejudiced by the faulty admission or to point us to other evidence corroborating these key points of Glenn's testimony. So without the preliminary hearing testimony, Glenn was not excluded—or at least not as easily excluded as he would have otherwise been. The State's theory required it to eliminate all other possible suspects; without Glenn's preliminary hearing testimony, it did not do so, and it is likely that the court would have concluded as much. In this respect, Glenn's testimony is like that at issue in *Ellis*, because it was "central to the prosecution's case" and "provided key pieces of evidence" under the State's process-of-elimination approach. *See* 2018 UT 2, ¶¶ 2, 43. And this testimony is unlike that deemed nonprejudicial in *Goins* and *Leech* because Meyer's conviction did "depend on the veracity of [Glenn's] account." *See Leech*, 2020 UT App 116, ¶ 62. Accordingly, the court's error in admitting Glenn's preliminary hearing testimony prejudiced Meyer.

CONCLUSION

¶40    The district court erred in admitting Glenn's preliminary hearing testimony, and Meyer was prejudiced by that error. We therefore vacate Meyer's conviction and remand this matter for further proceedings consistent with this opinion.

———————