**2025 UT App 99**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SERGIO BRISENO MEDINA,
Appellant.

Opinion
No. 20220789-CA
Filed July 3, 2025

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 161903223

Emily Adams, Freyja Johnson, and Rachel Phillips
Ainscough, Attorneys for Appellant

Derek E. Brown and Daniel W. Boyer,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

OLIVER, Judge:

¶1    Sergio Briseno Medina was convicted of the murder of Hope Gabaldon and obstructing justice. Medina appeals his convictions, arguing that the district court abused its discretion in ruling that a key witness in the prosecution's case was unavailable to testify at trial, and that he received constitutionally ineffective assistance of counsel. Medina also filed a motion pursuant to rule 23B of the Utah Rules of Appellate Procedure seeking a remand to support his ineffective assistance claim. We reject Medina's arguments, deny his rule 23B motion, and affirm his convictions.

## BACKGROUND[1]

*The Week Before Hope's Murder*

¶2 Hope and Medina were friends who were involved in selling drugs. Medina claimed he wanted to scare Hope out of the drug business. To that end, during the week before Hope's murder, Medina asked his girlfriend (Girlfriend) to call Hope from a blocked number and ask Hope if she was going to "take a deal." Girlfriend did so at least twice. Then, on February 24, 2016, Medina texted Girlfriend that he needed to "[t]ake someone out." When Girlfriend asked why, he responded, "No good."

*The Day of Hope's Murder*

¶3 Around 3:30 p.m. on February 25, Hope and Medina got into an argument about her allegedly accessing his phone and contacting people in the drug scene and stealing money from him. Based on cell phone records, the last communication between Hope and Medina occurred around 5:45 p.m. that day. By 9:51 p.m., Hope's phone was no longer sending or receiving information. Shortly after Hope's phone stopped working, Medina called his friend, Luis,[2] to ask for a ride because he was "stranded." When Medina could not get hold of Luis, he called another friend (Driver) for a ride. Medina did not give Driver an exact address. Instead, he gave her directions over the phone. Once she arrived, he asked her to take him to Girlfriend's house.

---

1. "On appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Speights*, 2021 UT 56, n.1, 497 P.3d 340 (cleaned up).

2. A pseudonym.

¶4     Close to the time Driver picked up Medina, a man returning home from the grocery store noticed a woman lying on the ground alongside the road, half in the gutter and half on the lawn, and called 911. When police officers arrived at the scene, the woman was still alive and was taken to the hospital. She had been stabbed eighteen times, and she ultimately succumbed to her injuries. The woman was later identified as Hope.

¶5     When Medina arrived at Girlfriend's house, he asked Girlfriend for a change of clothes. Medina went into Girlfriend's house for a few minutes before returning to Driver's car with a bag that he put in the backseat. Driver and Medina then left to get food before going to Driver's house.

¶6     After he left Girlfriend's house, Medina texted Girlfriend and told her that there were bags outside of her house that he wanted her to get rid of. When Girlfriend asked Medina when he had left them, he responded, "Just now." Girlfriend asked him what the bags looked like, and Medina described them only as "pink." When Girlfriend looked in the bags, she saw someone else's clothes, including sweaters, shoes, and women's underwear. She became upset because she thought Medina was asking her to wash another woman's clothes, and because the bags were not hers, she put them in the shed at her house.

¶7     When Medina and Driver arrived at Driver's house, Girlfriend texted Driver asking if Driver knew where Medina was. Driver told Medina about the texts, and Medina told Driver he did not want to talk to Girlfriend and to "just tell her that he left, and then to check the news." Driver relayed this to Girlfriend.

*The Day After Hope's Murder*

¶8     The next morning, Driver woke up to a text from Girlfriend with a link to a news article asking the public for help identifying the woman found by the side of the road. Driver did not respond to Girlfriend's message but she read the article and "kind of"

knew who it was about. Driver then woke up Medina and told him that he needed to leave, but she did not mention the article or the text from Girlfriend.

¶9 Driver gave Medina a ride to an apartment complex at Medina's instruction, and parked next to a gold Jeep, later determined by police to belong to Hope. Once Driver parked, Medina got out and grabbed several white, plastic grocery bags from inside the Jeep, which he put in Driver's car. Driver and Medina then met up with Luis. Luis watched Medina grab several items from Driver's car, including the grocery bags, water bottles, two license plates, Hope's gray purse, and some papers. Medina then left with Luis to go to another friend's (Friend 1) apartment.

¶10 While they were driving, Luis asked Medina about the grocery bags. Medina told Luis that he cleaned out Hope's Jeep and the grocery bags contained items from the Jeep. Luis then asked Medina why he cleaned out the Jeep. In response, Medina said, "Remember that bitch that I would take to your house?" When Luis answered in the affirmative, understanding Medina to be referring to Hope, Medina told him that he "took her out" in the parking lot of a swap meet and that he stabbed her in the head. Medina said that he thought she was dead at that point, but it turned out she was not, so he ran her over with the Jeep. Medina then pulled out a military-type knife from his pocket that had blood on it and showed it to Luis. Luis described the blade as being five to six inches long with a white, three-inch-long handle.

¶11 When Medina and Luis arrived at Friend 1's apartment, Medina asked Friend 1 if he had seen the news and then told Friend 1 that "he did it" and that he "took her out and killed her." Medina showed Friend 1 the same knife he had shown Luis.

¶12 Later that day, Medina called another friend (Friend 2), told him that he needed money, and asked if he could take Friend 2's truck. Medina then sent Friend 2 a link to the news article. After looking at the article, Friend 2 asked Medina if "he did that."

Medina replied in Spanish, "Ya sabes."[3] Medina had a third friend drive him to Rawlins, Wyoming. And from there, Medina took a bus to Colorado, where he was ultimately arrested by police.

*The Investigation*

¶13 When police searched Girlfriend's shed, they found a black duffel bag with pink trim and black garbage bags with blue handles. Inside the bags they found clothes as well as a service contract for one of Hope's vehicles. Police learned that a few weeks earlier, Hope and her sister went to their parents' house to clean out old clothing of theirs to donate. Hope's clothes were bagged up in black garbage bags with blue handles and she put the bags in her Jeep. Police also learned that the pink duffel bag "was basically Hope's life" and she took it "everywhere."

¶14 Police visited Luis's home and saw a knife similar to a steak knife in his car. Luis later met police at the police department for an interview, and he gave them his phone.

¶15 Police were able to look at location data for Hope's, Medina's, and Luis's phones. Location data showed that between 5:45 p.m. and 9:51 p.m. on February 25, Hope and Medina's phones were in the same general area, with only a few minutes of separation. When Hope's phone went silent at 9:51 p.m., Medina's phone was on and still in the same general area. Location data then showed Medina traveling about ten minutes north to an area that included the swap meet parking lot and the location where

---

3. Friend 2 testified that the meaning of "Ya sabes" can vary depending on the context of the situation and a person's demeanor. It can mean "[c]ome on bro" or "[y]ou know me better than that." It can also mean "[y]ou already know." The detective that oversaw Hope's case was fluent in Spanish and also testified that the meaning of the phrase can vary based on the context and that it can mean "[y]ou already know" or "[y]ou don't need the answer because you already have it."

Hope's body was found, about a half a mile away, and staying there from 10:15 p.m. to 11:10 p.m.

¶16    Location data also indicated that Luis's phone was in a coverage area that included the location where Hope was found from 9:05 p.m. to 9:06 p.m. and that it was in an area by his residence from 9:23 p.m. until 1:00 a.m. Location data did not put Luis's location near the swap meet parking lot, but it did show that Hope's phone could have been in the same area as Luis's phone from 9:38 p.m. to 9:51 p.m.

*The Police Interviews of Medina*

¶17    The police first interviewed Medina in Colorado, shortly after he was arrested. Medina told officers that on the night of Hope's murder, he waited to meet up with her at a gas station "by the pay phone, near the ice machine." But when police looked at the security tape from that gas station "considerably before and after the time frame" Medina gave them, Medina was not in the footage. Nor was there a pay phone when police visited the gas station. Medina also said he tried to call Hope that night, but his call records showed he did not place any calls to Hope.

¶18    Medina then tried to blame the murder on an acquaintance that Medina claimed "had romantic feelings" for Hope that she did not reciprocate. Medina professed he did not know where Hope's Jeep was, but he then stated that "it might be at a chop shop." He also told police that if they would take him back to Utah and let him out, he would work with them to try to find the Jeep. He also told police that he "guarantee[d] [they would] find nothing" in the Jeep that would link him to the crime. At the close of the interview, the officer interviewing Medina noted that he changed his story three times during the interview.

¶19    The police interviewed Medina again a few days later. Medina's second interview was not consistent with his first. Medina continued to blame his acquaintance for the murder until

police told him they had interviewed the acquaintance. At that point, Medina shifted his story and for the first time blamed Luis for the murder. He told the police that Luis called him and said that "he took care of her," apparently in reference to Hope. Medina had previously said that he did not have Luis's phone number, but phone records show that he called Luis several times on the night of Hope's murder.

¶20 Medina denied texting Girlfriend that he needed to "take someone out," instead telling police he texted Girlfriend that he needed to "take care of someone." He explained that by "take care of someone," he meant he needed to "go jump" Luis's little brother. However, text messages between Medina and Girlfriend revealed that Medina did in fact use the phrase "take someone out."

¶21 Medina also attempted to lie about asking Girlfriend to get rid of the pink duffel bag and trash bags. But after police told Medina they were aware of his text messages with Girlfriend, Medina admitted that he told her to get rid of the bags. Police pointed out to Medina that he kept lying and changing his story.[4]

¶22 Medina was charged with one count of murder and one count of obstructing justice for one of three statutory alternatives. The information alleged that by acting "with intent to hinder, delay, or prevent the investigation" into the murder, Medina

_____

4. Medina filed a motion to suppress the statements he made to police in the two interviews, arguing that his rights against self-incrimination had been violated. The district court granted Medina's motion to suppress, and the State filed a petition for an interlocutory appeal, which this court granted. This court reversed the grant of the motion to suppress, determining that Medina had knowingly and voluntarily waived his rights. *See State v. Medina*, 2019 UT App 49, ¶¶ 20–21, 28, 440 P.3d 846.

either (1) "prevented by force, intimidation, or deception, any person from performing any act that might aid in the discovery, apprehension, prosecution, conviction, or punishment of any person"; (2) "altered, destroyed, concealed, or removed any item or other thing"; or (3) "provided false information regarding a suspect, a witness, the conduct constituting an offense, or any other material aspect of the investigation."

*The Pretrial Proceedings*

¶23  At Medina's request, the court held a hearing on the admissibility of expert testimony from a police detective (Expert) who had overseen Hope's case and had training and experience with call and location data. The State intended to have Expert testify at trial about the location of Hope's, Medina's, and Luis's cell phones on the night of the murder. Medina argued that Expert's testimony would mislead the jury because it lacked foundation and asked the court to exclude it.

¶24  Expert testified that to generate the maps he created, he took the raw data he received from the cell phone carriers from the morning of February 25 through the early morning of February 26 and entered it into a geolocation program, which generated several reports. The program generated "an overlay in Google Earth to show where on the map certain cell sites are located and their coverage area." With the information generated from the program, Expert testified "that the cell phones were in a general area during the time of this crime." Expert acknowledged that there were limitations to the data, specifically that a cell phone that is powered off will not record data and that cell phones will hit off the towers with the strongest signals, which is not necessarily the closest tower. Expert conceded he did not know "the mathematical or scientific basis" of the program or how it generated reports. But he stated that he was familiar with the underlying data in the reports since he was the one who entered the data into the program.

¶25 Medina then called his own expert (Rebuttal Expert). Rebuttal Expert testified that there was no foundation for the boundaries drawn on the map and that he could only guess at the algorithm that the geolocation program used in creating the overlay. Rebuttal Expert testified that the "problem with [the] map is that the boundary" is "theoretical." And he further explained that it was inaccurate to say that the cell phones could not be outside of the boundaries drawn on the map because "the basis for the boundary" was unknown.

¶26 The court ruled that the evidence and testimony regarding mapping was admissible. It reasoned that though the map was "[t]heoretical in terms of location," which would be subject to cross-examination, Expert's knowledge was based on sufficient facts and data.

*Luis's Unavailability at Trial*

¶27 Luis was arrested on unrelated federal charges. The State obtained a material witness warrant[5] to ensure Luis would be available to testify at trial because he was subject to deportation to Mexico by the federal government. Concerned that Luis would nevertheless be deported prior to trial, the State "appl[ied] to the court for an order that [Luis] be examined conditionally by deposition" to preserve his testimony.[6] The court granted the

---

5. Rule 7C of the Utah Rules of Criminal Procedure permits the court to "issue a warrant and fix bail" to secure "the appearance of the witness" in a case where "it appears from an affidavit filed by a party that a material witness in a pending case will not appear and testify" at trial. Utah R. Crim P. 7C(a).

6. Rule 14(a)(8) of the Utah Rules of Criminal Procedure permits a witness to be deposed if there is "reason to believe a material witness is about to leave the state . . . or will not appear and testify pursuant to a subpoena." *Id.* R. 14(a)(8).

State's request over Medina's objection, and Luis's testimony was recorded on video on September 11, 2020.

¶28    Medina's trial began on March 2, 2022. At the close of the first day of the trial, the State brought to the court's attention that Luis had been deported to Mexico in 2021, and it had been unsuccessful in contacting him there. The State explained that it had been in contact with Luis's wife (Wife) and she said she was not in contact with Luis. The State had asked Wife for Luis's address so that it could send him mail or go to Mexico to encourage him to come testify, but it appears the State was unable to obtain his address. The State had also reached out to federal immigration officials and requested that they permit Luis to return to the United States to provide testimony at trial. And the State indicated that it had planned to buy a plane ticket for Luis, but it was unable to do so because he could not be located.

¶29    The following day, outside the presence of the jury, Luis's immigration attorney (Attorney) testified to his inability to get into contact with Luis. Attorney said that he had a phone number for Luis, but it was a communal village phone in Toluca, Mexico. Attorney explained that a person in the village will answer the phone, "find out . . . who the call is for and then try and locate that person in the town to call [him] back." However, he had never received a call back when he attempted to contact Luis. Like the State, Attorney had spoken to Wife, who originally had "semi-regular" communication with Luis, but in the months leading up to trial, "she also lost communication with [Luis]."

¶30    On day three of the trial, again outside the presence of the jury, Medina called a defense investigator (Investigator) who had looked into whether Luis was in the United States. Investigator, who had been hired the day before he testified, performed a social media search and found a Facebook page he believed belonged to Luis. The Facebook page indicated that Luis "lives and resides in West Valley." A picture posted on the Facebook page on

December 10, 2021, showed Luis working at a construction site with a background that Investigator thought looked similar to the Rocky Mountains. Comments on the post warned Luis to be careful and to stay safe. Investigator also pointed to a photo posted on January 10, 2022, of several children at the Gateway, a mall in Salt Lake City. Luis was not present in the photo, but one of the children in the photo appeared to be the same height and age as the child in a photo that he had posted on October 19, 2021. From that photo, Investigator inferred that the photo at the Gateway was a recent picture. Investigator also testified that he sat outside Wife's house for two hours the prior day but did not see anyone coming or going.

¶31   In response to Investigator's testimony, the court stated that it did not think the evidence rose "to the level . . . of some suggestion that [Luis] is presently here and, therefore, available as opposed to being unavailable." The court noted that Luis's testimony had been "preserved and taken . . . to be trial testimony" because of a risk that he would be unavailable to testify given his impending deportation. The court then found Luis unavailable to testify and permitted the State to play Luis's recorded testimony at trial.

*The Trial*

¶32   The State presented testimony from thirteen witnesses, who testified to the events as described above, and played Luis's recorded testimony. Expert testified to the general location of Medina's, Luis's, and Hope's phones around the time of Hope's murder based on the map generated by the geolocation program. Rebuttal Expert attended the trial and listened to Expert's testimony. After Expert's testimony, Rebuttal Expert consulted with Medina's trial counsel (Counsel) and Counsel ultimately chose not to call Rebuttal Expert. The prosecutor later spoke with Counsel and confirmed that the decision not to call Rebuttal Expert was Counsel's "strategy" because Expert "did not go

beyond the scope of [his] expertise and the science of the data, and did not say that he could exactly pinpoint a location."

¶33    The State argued in closing that Medina murdered Hope and that he obstructed the investigation into her murder by "tr[ying] to get rid of the evidence" and "lying to the police."

¶34    Medina's defense at trial was that Luis killed Hope and framed Medina. During closing argument, Counsel argued that Medina feared Luis and that is why "some of his details were a little off" during his police interviews. Counsel emphasized that Luis lived "within a mile of where [Hope's] body was found" and suggested that Hope's phone was left at Luis's after he killed her. Counsel also suggested Luis could have murdered Hope with the steak knife officers saw in his vehicle when visiting his home.

¶35    The jury convicted Medina of both murder and obstructing justice. He was sentenced to a minimum of fifteen years for the murder conviction and one to fifteen years for the obstructing justice conviction.

*Motion for a New Trial*

¶36    After sentencing, Medina obtained new counsel and moved for a new trial. He argued that Counsel was ineffective for failing to (1) call Rebuttal Expert to testify on cell phone location data and (2) request a unanimity instruction or special verdict form for the obstructing justice charge. The district court denied the motion, stating that Medina did not meet his burden of demonstrating a reasonable probability that, but for the errors of Counsel, the outcome of the trial would have been different.

ISSUES AND STANDARDS OF REVIEW

¶37    On appeal, Medina challenges the district court's ruling that Luis was unavailable to testify at trial. "When reviewing

rulings on hearsay, appellate courts review legal questions regarding admissibility for correctness, questions of fact for clear error, and the final ruling on admissibility for abuse of discretion." *State v. Meyer*, 2023 UT App 65, ¶ 23, 532 P.3d 583 (cleaned up).

¶38 Next, Medina argues that the district court erred in denying his motion for a new trial. "[W]hen a district court rules on a criminal defendant's claim that he was deprived of his Sixth Amendment right to counsel due to ineffective assistance, the district court's determination of whether the defendant received constitutionally ineffective assistance is reviewed for correctness." *State v. Torres-Orellana*, 2024 UT 46, ¶ 6, 562 P.3d 706.

¶39 Finally, Medina filed a rule 23B motion under the Utah Rules of Appellate Procedure and asks us to "remand the case to the [district] court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). "A remand under rule 23B will only be granted upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *State v. Lee*, 2014 UT App 4, ¶ 5, 318 P.3d 1164 (cleaned up).

ANALYSIS

I. Luis's Unavailability to Testify at Trial

¶40 Hearsay is ordinarily inadmissible at trial unless it falls under an exception. Utah R. Evid. 801. One such exception—set forth in rule 804 of the Utah Rules of Evidence—allows former testimony to be admitted when a witness is unavailable to testify at trial if the testimony meets the requirements set forth in the rule. *Id.* R. 804(b); *State v. Goins*, 2017 UT 61, ¶ 27, 423 P.3d 1236 ("The rule 804 exception extends only to circumstances in which the declarant is considered unavailable."). A witness is

unavailable if the witness "is absent from the trial or hearing" and the party calling the witness "has not been able, by process or other reasonable means, to procure [the witness's] attendance."[7] Utah R. Evid. 804(a)(5).

¶41 Early on in the case, the State was aware that Luis might not be available to testify at trial because he was subject to deportation by the federal government. Other courts have recognized that "state prosecutors have no ability to block deportation if the federal government is determined to deport someone swiftly." *People v. Torres*, 262 Cal. Rptr. 3d 291, 297 (Cal. Ct. App. 2020). But, as the California Court of Appeal explained, that does not excuse the State from its obligations:

> [E]ven when a witness's deportation prior to trial cannot reasonably be avoided, the government must still undertake reasonable and good faith efforts to procure his attendance at trial. . . . In other words, the government cannot simply throw up its hands and do nothing when faced with the prospect of one of its witnesses being deported or leaving the country on his own accord. Instead, it must

---

7. Our supreme court has noted that it has "not had the opportunity to address the standard for unavailability under rule 804(a)(5) or to opine on whether rule 804 propounds a different standard than the test for Confrontation Clause purposes." *State v. Goins*, 2017 UT 61, ¶ 28 n.7, 423 P.3d 1236. The court explained it has not been consistent in its articulation of the test for availability for Confrontation Clause purposes, having spoken in terms of whether it was "practically impossible to produce the witness in court" and whether the proponent of the evidence "has used all reasonable means at his disposal to secure the attendance of the witness." *Id.* (cleaned up). But we need not resolve this issue here because, under either formulation, the State met its burden with respect to Luis's unavailability at trial. *See infra* ¶¶ 43–46.

undertake reasonable efforts to preserve the defendant's constitutional right to be confronted with the witnesses against him.

*People v. Roldan*, 205 Cal. App. 4th 969, 980 (Cal. Ct. App. 2012) (applying California Evidence Code section 240(a)(5)); *compare* Cal. Evid. Code § 240(a)(5) ("the proponent of [the declarant's] statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process"), *with* Utah R. Evid. 804(a)(5) (the "proponent has not been able, by process or other reasonable means, to procure the declarant's attendance"). The California Court of Appeal identified "one of the things the prosecution could have done to protect [the defendant]'s right of confrontation was to videotape [the witness]'s" testimony. *Roldan*, 205 Cal. App. 4th at 980–81. Here, the State did just that.

¶42 Understanding the risk that Luis could be deported before trial, the State first obtained a material witness warrant to secure his testimony. *See* Utah R. Crim. P. 7C. And when it became apparent that Luis would likely be deported before the trial could occur, the State obtained a court order and recorded his testimony on video in order to preserve it for trial. *See id.* R. 14(a)(8).

¶43 Medina does not appear to question the State's actions with respect to the recording of Luis's testimony. Rather, Medina argues that the State's efforts to bring Luis to testify in-person at trial were insufficient and that the district court abused its discretion in finding otherwise. In support of his argument, Medina asserts that "the majority of the State's efforts to locate [Luis] were made assuming that he was in Mexico" despite "photographs and Facebook posts indicat[ing] [Luis] had been in Utah." Specifically, Medina asserts that the State should have done more to locate Luis, such as "look[ing] for [him]" at Wife's "or other family member's houses." But when we consider both the efforts the State undertook to locate Luis and Medina's

evidence regarding Luis's whereabouts, we fail to see any abuse of discretion by the district court in concluding that Luis was "presently unavailable" for trial.

¶44 First, the State made multiple attempts to contact Luis at his last known location, which was a village in Mexico that had only a shared telephone. Second, the State spoke to Wife, who told the State she had lost contact with Luis in the months before trial. The State asked her for an address for Luis, but did not obtain one. Third, the State spoke to Attorney to attempt to locate Luis. And the district court heard testimony from Attorney as to his information regarding Luis's whereabouts and efforts to contact him, all of which were unsuccessful. Fourth, the State contacted immigration officials to arrange for Luis to be able to return to the United States to testify at the trial. Finally, the State investigated the cost of a round-trip plane ticket for Luis to fly from Mexico to Salt Lake City and was willing to purchase the ticket.

¶45 None of the evidence put forth by Medina suggests that these efforts were insufficient. Indeed, the evidence presented by Medina was rather weak. Investigator, who had been hired the day before he testified, "conducted a social media search" for Luis and found a Facebook page that he believed belonged to Luis. Investigator testified that there were several photographs on the Facebook page that appeared connected to Utah. One photograph was posted[8] on January 10, 2022—approximately two months before the trial started—and showed children, who Investigator thought were Luis's, at the Gateway. Luis is not in the first photograph. The second photograph was posted on December 10, 2021, and showed a man, who Investigator believed was Luis, working on a construction site with mountains in the background, but Investigator could not confirm the location of the second photograph. Investigator also noted the Facebook page showed

---

8. Investigator admitted that he did not know when any of the photographs were taken or by whom.

that Luis "lives and resides in West Valley." And Investigator testified that he had gone to Wife's home and waited "for a couple of hours" but that no one came or went. None of this evidence demonstrated that Luis was present in Utah at any time after he was deported, let alone at the time of trial.

¶46   Considering all this evidence, the State demonstrated both that it "used all reasonable means at [its] disposal" to try and locate Luis and facilitate his return to Salt Lake City for trial and that it was "practically impossible to produce [Luis] in court." *State v. Goins*, 2017 UT 61, ¶ 27 n.7, 423 P.3d 1236 (cleaned up). Thus, the district court did not abuse its discretion in permitting the State to play the recording of Luis's testimony at trial. *See State v. Draper*, 2024 UT App 152, ¶ 60, 560 P.3d 122 ("An abuse of discretion occurs only if it can be said that no reasonable person would take the view adopted by the district court." (cleaned up)).

## II. Ineffective Assistance of Counsel

¶47   To prove ineffective assistance of counsel, a defendant must first demonstrate "that counsel's performance was deficient," meaning it "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). But an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. Thus, a defendant must also show that counsel's "deficient performance prejudiced the defense." *Id.* at 687. To do so, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "A defendant's inability to establish either" that his counsel's performance was deficient or that such deficient performance prejudiced the defense "defeats a claim for

ineffective assistance of counsel." *State v. Miller*, 2023 UT App 85, ¶ 25, 535 P.3d 390 (cleaned up), *cert. denied*, 540 P.3d 78 (Utah 2023).

A.      Unanimity Instruction

¶48     Our unanimous verdict caselaw is "well-established." *State v. Paule*, 2024 UT 2, ¶ 67, 554 P.3d 844. "The Utah Constitution's Unanimous Verdict Clause expressly protects a criminal defendant's right to a unanimous verdict." *Id.* This constitutional requirement "is not met if a jury unanimously finds only that a defendant is guilty *of a crime*" rather than that the defendant is guilty of "each count of *each distinct crime charged* by the prosecution and submitted to the jury for decision." *Id.* (cleaned up). "Where the evidence indicates that more than one distinct criminal act has been committed but the defendant is charged with only one count of criminal conduct . . . the jury must be unanimous as to which act or incident constitutes the charged crime." *State v. Jiminez*, 2025 UT App 76, ¶ 34 (cleaned up).

¶49     Here, even assuming, without deciding, that Counsel performed deficiently by not requesting a unanimity instruction for the obstructing justice charge, deficient performance alone does not amount to ineffective assistance. *See Strickland*, 466 U.S. at 691. Medina must also show that he was prejudiced because "there existed a reasonable probability of a different outcome had the jury been provided a specific unanimity instruction." *State v. Mottaghian*, 2022 UT App 8, ¶ 59, 504 P.3d 773. Thus, Medina must demonstrate that if the jurors were given a unanimity instruction, they would not have agreed that any one act amounted to obstruction. *See State v. Percival*, 2020 UT App 75, ¶ 29, 464 P.3d 1184 (holding that there was "no reasonable likelihood that the jury would not have agreed on any one victim" having been stabbed when the evidence "overwhelmingly established" that three people were stabbed during a fracas and only the defendant was "wielding a knife").

¶50    Medina argues that he was prejudiced by Counsel not requesting a unanimity instruction because the State alleged several specific acts of obstruction. Because Medina believes there was "conflicting evidence in support of each" act of obstruction, he argues that "there is a reasonable likelihood that at least some jurors would have had reasonable doubt" as to some of the acts. Specifically, Medina points to conflicting evidence about when and why the pink duffel bag was taken to Girlfriend's house, whether Medina would have had Hope's keys to access her Jeep, where Hope's and Medina's phones were, and where the knife was that was used to murder Hope. He therefore argues that there would have been a different result if the jury was instructed that it had to unanimously agree on which act constituted obstruction.

¶51    But Medina ignores his most obvious act of obstruction— he lied repeatedly to police during his two interviews. In Medina's first interview with police, he lied about (1) waiting for Hope at a specific gas station "by the pay phone, near the ice machine," (2) calling Hope the night of her murder, (3) claiming an acquaintance who "had romantic feelings" for Hope that were not reciprocated was the murderer, and (4) knowing the location of Hope's Jeep and claiming that "it might be at a chop shop." In Medina's second interview with police, he lied about (5) texting Girlfriend that he needed to "take someone out," (6) asking Girlfriend to dispose of the pink duffel bag and trash bags, (7) claiming (again) that his acquaintance committed the murder, and (8) claiming that Luis murdered Hope because he called Medina and said "he took care of her." At trial, the State presented strong—and in most instances, conclusive—evidence that Medina's statements were lies. And on appeal, Medina does not dispute that he lied to the police.

¶52    On this evidence, we conclude that Medina has not demonstrated a reasonable likelihood of a different result at trial if the jury had been given a unanimity instruction. "[T]he jury would have had no difficulty in unanimously agreeing" that

Medina's lies to the police supported the obstructing justice charge. *Mottaghian*, 2022 UT App 8, ¶ 66; *see also id.* (holding that the lack of a unanimity instruction did not prejudice the defendant where there was "enough uncontested [conduct] to satisfy all of the charged counts"). Thus, we have little doubt that even had the jurors been instructed that they needed to agree on the specific conduct that constituted obstructing justice, the jurors would have unanimously agreed on the obstructive act of lying to police and convicted Medina, especially when Medina presented no evidence to the contrary. *See State v. Amboh*, 2023 UT App 150, ¶ 34, 541 P.3d 299 (holding that because strong evidence supported a defendant's conviction, it was unlikely that the defendant "would have received a more favorable outcome at trial if the jury had been properly instructed on unanimity").

¶53 Accordingly, even assuming that Counsel performed deficiently by not requesting a unanimity instruction, Medina has failed to show that he was prejudiced. Thus, Medina has failed to demonstrate ineffective assistance of counsel.

B.    Rebuttal Expert

¶54 An appellate court's review of Counsel's performance is "highly deferential" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). "If the court concludes that the challenged action might be considered sound trial strategy, it follows that counsel did not perform deficiently." *State v. Powell*, 2020 UT App 63, ¶ 20, 463 P.3d 705 (cleaned up). However, even where "an omission is inadvertent and not due to a purposeful strategy, relief is not automatic. Instead, . . . the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Miller*, 2023 UT App 85, ¶ 26, 535 P.3d 390 (cleaned up). "Counsel's performance can be objectively reasonable despite a failure to

employ the best strategy." *State v. Paule*, 2024 UT 2, ¶ 71, 554 P.3d 844 (cleaned up).

¶55 Medina argues on appeal that it was objectively unreasonable to not call Rebuttal Expert to testify about cell phone location data. Specifically, Medina asserts that cross-examination of Expert alone did not elicit "the vital information" to which Rebuttal Expert would have testified, namely, "the flaws or limitations" in Expert's data that would have "undermined" Expert's mapping that showed Luis was not near Hope's body.

¶56 But Medina's primary argument at trial was that Luis murdered Hope. Expert had presented evidence that showed Luis's cell phone was in the same area as Hope's during several time periods on the night of her murder. If Medina's intention in calling Rebuttal Expert was to diminish Expert's credibility and highlight the flaws in Expert's mapping, as Medina now claims it would have been, then Luis's location at the time of Hope's murder would also no longer be credible. Thus, Counsel was left to decide whether calling Rebuttal Expert to testify was worth the risk that, by doing so, Counsel would also undermine Expert's testimony that Luis's cell phone was near Hope's at the time of her murder. Counsel chose not to take the risk. This was a reasonable trial strategy.

¶57 Furthermore, Rebuttal Expert testified at the evidentiary hearing and sat through the entirety of the trial. The State even conferred with Counsel and confirmed that not calling Rebuttal Expert was part of the defense's trial "strategy" because Expert "did not go beyond the scope of [his] expertise and the science of the data." The prior use of Rebuttal Expert and the presence of Rebuttal Expert at trial further demonstrates that Counsel made a strategic choice not to call Rebuttal Expert to the stand and to instead rely on Expert's testimony about the cell phone location data. And at closing, Counsel explained to the jury that under Medina's theory of the case, Luis and Hope were at Luis's house

before he left his phone at home to avoid a digital footprint and kill Hope. Therefore, Counsel's performance was not deficient, and Medina has not shown that he received constitutionally ineffective assistance.

### III. Rule 23B Motion for Remand

¶58    Rule 23B of the Utah Rules of Appellate Procedure permits a party appealing a criminal case to move the court to "remand the case to the [district] court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). Such a motion is only available "upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.* Rule 23B requires the motion to include "affidavits or declarations alleging facts not fully appearing in the record on appeal that show the claimed deficient performance of the attorney." *Id.* R. 23B(b). Here, Medina attached a declaration by Counsel that stated the "failure to call [Rebuttal Expert] was not a tactical decision, it was a mistake."

¶59    As discussed above, *see supra* ¶ 54, deficient performance is an objective standard. Therefore, whether in retrospect Counsel now considers the decision to not call Rebuttal Expert a "mistake" —instead of a strategic decision as Counsel had confirmed to the State at the time of trial—is not dispositive to our review. And just because Counsel thinks he made a mistake does not mean that his action was objectively unreasonable. Indeed, "even if a court concludes that counsel made an error, the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Miller*, 2023 UT App 85, ¶ 26, 535 P.3d 390 (cleaned up), *cert. denied*, 540 P.3d 78 (Utah 2023).

¶60    As discussed above, calling Rebuttal Expert would have undermined Medina's theory of his defense and was unlikely to

result in an acquittal. *See supra* ¶¶ 56–57. Thus, it was not objectively unreasonable for Counsel to decide to not call Rebuttal Expert. We therefore deny Medina's rule 23B motion.

## CONCLUSION

¶61    Medina has not demonstrated that the district court abused its discretion in finding Luis unavailable to testify, nor has he shown that he received ineffective assistance of counsel. Accordingly, we deny Medina's rule 23B motion and affirm his convictions.

—————